# STRAWN ET AL v. STATE TAX COMMISSION

John M. Eaton, District Attorney, Coos County, Coquille, argued the cause for plaintiff.

A. W. Pedersen, Assistant Attorney General, Salem, argued the cause for defendant.

John B. Crowell, Jr., Portland, argued the cause for intervener defendant.

Charles O. Porter, Eugene, argued the cause for interveners.

Decision denying motion and petition rendered April 6, 1962.

PETER M. GUNNAR, Judge.

These two cases arise out of a single assessment by the Assessor of Coos County of certain railroad rolling stock of Coos Bay Timber Co.⊙ in Coos County, Oregon. This equipment, all personal property, was assessed by the Coos County Assessor as having a true cash value of $997,514. From this assessment the Coos Bay Timber Co. appealed to the State Tax Commission, which by its opinion and order No. VL 61-322, dated December 15, 1961, reduced said assessment to $662,664. Before the Board of Equalization and the State Tax Commission, Coos Bay Timber Co. contended for a true cash value of $440,810.

On February 9, 1962, Messrs. Strawn and Flanagan, in their official capacities and represented by John M. Eaton, District Attorney for Coos County, filed in this court their complaint in *Strawn et al v. State Tax Commission* (herein called the Strawn case), seeking review of the Tax Commission's order No. VL 61-322 and the restoration of the valuation originally placed upon the personal property by the assessor.

On February 13, 1962, Coos Bay Timber Co. filed a complaint in a separate case entitled *"Coos Bay Timber Co. v. Commissioners of the State Tax Commission"* (sometimes called herein the "Coos Bay case") seeking like review of the same Tax Commission order, but seeking reduction of the value to the amount originally contended by Coos Bay Timber Co.

---

⊙ In addition to the Strawn case, Coos Bay Timber Company filed suit with the intent of further reducing the Tax Commission's order. However, since the issues in both suits would be substantially identical, the Timber Company elected to hold their case in abeyance pending the outcome of the Strawn decision.

Together with the complaint, John B. Crowell, Jr., attorney for Coos Bay Timber Co., addressed a covering letter to the court in which he said, in part:

"* * * We are doubtful, however, about our right as a matter of practice and procedure to join what would amount to a cross-complaint against the Tax Commission with our intervenor's complaint by way of answer to the Coos County complaint. Thus, in order to be certain of preserving our rights to seek a lower valuation in addition to resisting the efforts of Coos County to restore the original valuation we have initiated this proceeding, anticipating that some basis for joining or consolidating the two can eventually be worked out by the various parties at the court."

At no time in these proceedings did the State Tax Commission, as defendant in both cases, serve or file any pleadings, although the file contains a letter from the commission indicating a willingness that the matter proceed to trial.

On March 12, 1962, District Attorney Eaton moved in the Strawn case for an order dismissing the complaint with prejudice and without costs. Before filing this motion the district attorney consulted the sheriff and assessor. They were not adverse to dismissal but did not want to dismiss at this time. By his own statements, Mr. Eaton filed his motion without his clients' consent and for his own purposes. To quote the record:

MR. EATON: "* * * After conferences with Mr. Strawn and Mr. Flanagan, neither of whom seemed to oppose—they felt that I was their attorney, that I was the one that was trained in the law, that I was the one by law who was required to represent them—they neither one seemed to oppose my idea that the case should not come to trial in this court, but they both felt that for political rea-

sons that perhaps we shouldn't file the motion to dismiss at the exact time that I did. Because of some rather unfortunate remarks that the County Commissioner made over television I felt required to be on television in answer to some of his statements about me and I thought that I couldn't ethically discuss this case so long as it were pending in the court and I therefore moved to dismiss the case in order—at that time—in order to be free to dismiss the case before a television audience. At that time neither Mr. Strawn nor Mr. Flanagan had specifically authorized me to file such a motion—as I say they had indicated they were not unwilling to dismiss, but they didn't want to do it right at that point for political reasons." (Transcript of preliminary hearing, Strawn, et al v. State Tax Commission, held on 30 March 1962, 10 a.m., Coos County, Oregon.)

The district attorney's motion to dismiss apparently created quite a stir in Coos County. Thereafter, on March 19, 1962, Charles O. Porter, as attorney for G. M. Carroll and 153 others, alleged to be residents and taxpayers in Coos County, filed a petition to intervene in the Strawn case, attaching thereto a complaint in which they seek the review of this court of the State Tax Commission's order and the increase of the valuation to $900,000.

Earlier on the same day, March 19, 1962, Coos Bay Timber Co., in its case against the Tax Commission, filed its conditional motion to dismiss its case with prejudice and without costs, conditioned upon the dismissal of the Strawn case.

On March 23, 1962, Coos Bay Timber Co. tendered to the court in the Strawn case its petition to intervene and attached thereto its "Intervener Defendant's Cross-Complaint for Refund of 1960-61 Personal Prop-

erty Taxes" and also, its "Intervener Defendant's Complaint by Way of Answer." At the direction of the judge, the clerk of this court ignored the petition to intervene of Coos Bay Timber Co. and filed these two strangely entitled documents.

With the record in this confused state of pleadings, the court set for hearing in Coos County the two motions to dismiss and the petition of the taxpayer group to intervene, and it is upon these matters that hearing was had and this preliminary decision is written.

The issues before the court are as follows:

a. When the District Attorney of Coos County filed his motion to dismiss on March 12, 1962, did he have an absolute right to the dismissal of his case or is such dismissal discretionary with the court?

b. If discretionary, should the court grant the District Attorney's motion to dismiss?

c. Is the taxpayers group a proper intervener in the Strawn case?

d. When Coos Bay Timber Company filed its motion to dismiss on March 19, 1962, did it have an absolute right to the order of dismissal?

■ Generally, a plaintiff has an absolute right to withdraw his case, unless a counter-claim has been pleaded as a defense. ORS 18.210; *Goin v. Chute,* 126 Or 466, 260 P 998, 270 P 492 (1928); *Chance v. Carter,* 81 Or 229, 158 P 947 (1916); *Currie v. Southern Pacific Co.,* 23 Or 400, 31 P 964 (1893). This statute and these cases are based on the reasoning that the burden of the case is on the plaintiff and that, because of this burden, he should have the right to guide the pleadings and to withdraw temporarily, if the conditions under which the case is to be tried are particularly disadvantage-

ous. As pointed out by Mr. Justice ROSSMAN in *Goin v. Chute, supra,* in quoting from *Reed v. Rocap,* 9 N.J. Law, 349:

> " 'The principle on which this permission to withdraw is founded, is that the procedure on the part of the plaintiff is his own, instituted for his own benefit; that in abandoning it he affects or abridges the right of no other person; and as he must pay costs to his adversary, he is thereby deemed, in legal contemplation, to make him indemnity for calling him into court; so long then as he can exercise control over the proceedings without interfering with the established rights of another, he is permitted to do so. But whenever such proceedings have occurred, or the suit has so far advanced that any right of the adverse party has been legally established, or may be abridged by a relinquishment of further proceedings, the power of the plaintiff has ceased.' "

Unquestionably, then, it is the law in Oregon, as expounded in the above cited cases, that a private plaintiff has an absolute right to dismiss his suit in equity when no counter-claim has been filed by the defendant and when the decree does not bar another suit for the same cause, or any part thereof. But this rule does not apply to the instant case for four sound reasons.

■ First, these cases and our statute clearly contemplate a dismissal without prejudice and provide that the judgment or decree "shall not have the effect to bar another suit for the same cause, or any part thereof." ORS 18.210. In the instant case, the effect of the desired order to dismiss "with prejudice" would be to terminate and to bar another suit for the same cause. This is true initially because the statutory time within which an appeal could be taken had run at the time of the filing of the plaintiff's motion, and this

statutory time is jurisdictional. Secondly, the motion as presented to this court sought dismissal with prejudice.

██ Secondly, the Strawn case is not the usual proceeding brought by a private plaintiff, but is an appeal brought not by the taxpayer, but by public officials, being the first of its kind under a newly enacted statute. The plaintiffs, in moving to dismiss, were not giving up a right which was theirs alone and individually, but were moving to forever terminate the rights of the people of Coos County to further consideration of a fairly substantial tax liability of one of its residents. Where the rights of the public become involved in a procedural matter, such as this motion to dismiss, the court has a greater duty to be certain that the public rights are best served by the allowance of a motion of this nature. *Guinther v. Milwaukee,* 217 Wis 334, 258 NW 865 (1935). Because of this duty, this motion to dismiss should not be treated as being based upon an absolute right to dismissal, but rather upon the discretion of the court soundly exercised.

Thirdly, even if the general rule requiring dismissal were applied to this case, the "unless" provision of the statute remains. The question of whether or not a counter-claim was on file at the time the motion to dismiss was filed returns us to the extremely confused state of the pleadings in these two cases.

■ Both cases, dealing as they do with an identical situation, confer upon the court jurisdiction to determine the true cash value of the personal property in question in the tax year 1960. In form, they are two separate cases, but in substance, they appear to be a single, indissoluble controversy. ORS 306.545(3) gives to the taxpayer who owns the property in ques-

tion the right to appear and be heard in an appeal taken from the State Tax Commission in which the taxpayer-owner is not the appealing party. In addition, subsection (1) of that section requires that the petition be served upon such taxpayer-owner. Thus, by virtue of the required service upon it and the absolute, not discretionary, right to appear and be heard, Coos Bay Timber Co. is a party to the Strawn case. Neither by statute nor by court rule is the taxpayer required to file written pleadings. No limitation is placed upon the nature of its evidence. In the end result, it is the function of the court to find the true cash value of the property in question. Without responsive pleadings and without filing a separate case, the taxpayer-owner, though not the appealing party, could introduce evidence of a true cash value substantially less than the amount found by the State Tax Commission, and if this evidence were found by the court compelling, the court could find the value to be less than the amount determined by the commission. In other words, the statute created an inchoate counter-claim on the part of the taxpayer-owner in this case. The taxpayer did not have to plead the counter-claim as to value to create it, and by dismissing the suit the court would be denying to the taxpayer its statutory right to have heard its inchoate counter-claim on the issue of value.

■ In addition, referring back to the first reason for discretionary power, the dismissal with prejudice not only would constitute a bar to any further proceeding by the plaintiffs, but would be a bar, under the doctrine of *res judicata,* to any proceeding by the taxpayer-owner, including the Coos Bay case already on file. This is because the only issue is one of value,

there can be only one true cash value, and the statute, by requiring service and providing the right to appear and be heard, makes the timber company a party in the Strawn case. By making the taxpayer a party, the doctrine of *res judicata* is invoked as to all issues which were, or could have been, raised between the parties in this cause.

Fourthly, and again on the issue of the existence of the counter-claim, it is obvious from the record that the timber company was in doubt as to the proper procedure but that it sought to present to this court its contention as to value. By filing a separate suit, it confused the record, though in all probability it placed the court upon further notice of its contention as to the value of the personal property, of which the court already had notice from the Strawn complaint and the exhibits attached to it. The subsequent petition to intervene, filed by the timber company, which the court ignored, was yet a further attempt to establish its rights to counter-claim.

■ There was no need for the taxpayer-owner in this case to petition to intervene. The applicable statute, ORS 306.545(3), states:

"(3) In any case in which the taxpayer is not the appealing party, he shall have the right to appear and be heard. The Oregon Tax Court, in its discretion, may permit other interested persons to intervene by filing a petition in such manner and under such conditions as the court may deem appropriate."

Clearly, this statute makes absolute and not subject to the discretion of the court this right of the timber company to appear and be heard. Since the court had no discretion, there could be no need for any peti-

tion to the court's discretion. The intervention petition would be appropriate only with respect to persons who are not parties plaintiff, not the State Tax Commission, and not the taxpayer-owner. The proper, though perhaps not the only, procedure by which the timber company could assert its contention as to value was not to file a separate suit and not to petition to intervene, but rather was to file an answer denying the appropriate allegations of the plaintiffs' complaint and setting forth a counter-claim alleging affirmatively the valuation contentions of the taxpayer. This procedure of filing an answer and counter-claim would appear to be preferable, though actually, without any pleading, the statute entitles the taxpayer-owner to rely upon its right to appear and be heard.

Instead, the timber company filed a separate suit. Obviously, if the Strawn case is heard first, this separate suit has no effect, the determination in the Strawn case being *res judicata* in the Coos Bay case and terminating the litigation. The complaint in the Coos Bay case was subject to a plea in abatement *pendente lite,* had the nonresponsive State Tax Commission seen fit to file one. Of course, the statute clearly provides that "no responsive pleadings shall be required of" the State Tax Commission. The only logical effect that reasonably could be given to the complaint of Coos Bay Timber Company was that it was an improperly worded and tendered counter-claim in the Strawn case. Because this court is new and because its procedures may be somewhat obscure to the average practitioner this early in its existence, justice would appear to support the treatment of the complaint as, in fact, a counter-claim.

Therefore, because the motion sought dismissal

with prejudice, because its effect would be to bar another suit for the same cause, because the sheriff's and assessor's appeal was not an ordinary proceeding but was one as to which the court had a duty to be certain that the public rights were best served by the allowance of the motion, because without any pleadings the defendant had the right to pursue what amounts to a counter-claim arising out of its right to appear and be heard, and because, by a liberal construction of the faulty pleadings in this case, the separate suit of the taxpayer-owner might be deemed in effect a counter-claim, the general rule establishing an absolute right to withdraw its case does not apply to the plaintiffs' motion to dismiss in this case and the allowance of the motion is within the sound discretion of the court.

■ Turning to the second issue, as to how the court should exercise its discretion, we must consider first the factual situation. From the clear admissions of the district attorney, it is established that he filed the motion to dismiss with prejudice contrary to the directions of his clients. The district attorney contends that he had the right to control the proceeding just as he would have the right to control a criminal proceeding and that its prosecution is discretionary with him. However, this is not the ordinary criminal proceeding. In the criminal proceeding, he, as district attorney, alone has the power and duty to initiate the prosecution and is the only public officer representing the people. Thus, with the power to initiate, the law has vested in him the power to terminate the prosecution. On the other hand, the legislature gave the power to initiate a tax appeal not to the district attorney but to the county assessor, board of equal-

ization, or sheriff. ORS 306.545. Had neither the sheriff, the assessor, nor the board of equalization seen fit to file the appeal in the first instance, the district attorney would have been powerless to appeal the decision of the State Tax Commission. The concurrence, and actually the active prosecution, by one or more of the public officials named in the statute is required for the institution of their appeal. With the power to initiate vested in the sheriff, assessor, and the board of equalization, it would appear that the power to terminate must be vested in them also and that the district attorney would have no power upon his own motion without their consent to file the motion to dismiss.

In the instant case, from the unequivocal admissions of the district attorney, it appears that he did file such motion to dismiss without the consent of the sheriff or assessor, who, while they concurred in dismissal, felt that they did not wish to file such a motion at the time it was filed. The district attorney stated to the court that nonetheless he had filed the motion at this particular time and gave as his reason that he desired to be free of the responsibility of litigation so that he could answer charges made against him by the chairman of the county commission. The reason is not legally compelling.

In justification of his actions the district attorney contends that the county, through its assessor and sheriff, had no basis in either the law or the facts for proceeding with the appeal. He interprets the decision in *Roseburg Lumber Company v. State Tax Commission,* 223 Or 294, 355 P2d 606 (1960), as shifting the burden of proof to the county in this appeal. However, *Westhouse, Inc. v. State Tax Commission,*

228 Or 167, 364 P2d 598, (1961) is clear authority for the rule that the presumption of official rectitude attaches not to the State Tax Commission's determination, but to the original assessment by the Assessor of Coos County. Since presumptions are evidence in Oregon, there clearly is some evidence to support the finding of the assessor. This is a *de novo* appeal from an inferior, quasi-judicial tribunal. Those presumptions upon which the assessor was entitled to rely before the commission are not stripped from him upon appeal to this court.

In addition, this court will not assume that the assessor had no basis for his valuation in the first instance, but rather, in this *de novo* proceeding, would assume that some evidence exists for the original valuation and that the issue is one of the weight of the evidence. Of course, the assessor's evidence may, or may not, be sufficient to sustain the plaintiffs' case; but whether it is sufficient or not must yet be determined, and it is reasonable at this point to assume that the citizens of Coos County have some interest in this litigation and some basis for the appeal originally presented by the sheriff and the county assessor.

The purpose of this court is to hear and determine tax controversies and to consider *de novo* the evidence which heretofore in such cases was presented to the State Tax Commission and upon which that Commission made its ruling. There seems little ground for denying such a hearing to the people of Coos County solely upon the discretionary actions of the district attorney, unsupported by the concurrence of the sheriff and assessor, his clients, and influenced to some degree by his admitted personal preference to be rid of the litigation for reasons of personal con-

cern. For these reasons, this court exercises its discretion to deny the motion of the plaintiffs for dismissal of the Strawn case with prejudice.

Turning to the question of intervention by the taxpayer group, the questions before the court appear to be whether or not the taxpayers are "other interested persons" so as to justify intervention and whether, under the circumstances, intervention should be permitted.

■ In this case, the interveners represent all taxpayers in Coos County by virtue of the derivative nature of their intervention proceeding, and therefore, appear to be proper parties. However, the general rule is that intervention is not permitted in proceedings brought by public officers when the interveners are those for whom the public officers are acting. *Best & Co. v. Omaha,* 149 Neb 868, 33 NW2d 150 (1948). In this case the sheriff and assessor are acting for all the people of Coos County in prosecuting their appeal. To permit the interveners now to intervene would be to add additional confusion without increasing the representation of the taxpayers of Coos County.

■ The only justification found in the law for permitting such intervention exists where the public officials fail diligently to prosecute in the interest of the people of their body politic. *State v. Farmer's State Bank of Decatur,* 103 Neb 194, 170 NW 901 (1919). Substantial evidence in this case shows such failure to exist already, which would justify permission to intervene.

However, the court has a duty to see that its proceedings are orderly and progress with as little confusion as possible. Furthermore, the court is not required from the action of Mr. Eaton to assume that

the sheriff and assessor will not diligently prosecute their appeal and that Mr. Eaton will fail henceforth to represent the assessor and sheriff adequately, with spirit and diligence. Certainly, Mr. Eaton's remarks to the court were honest, forthright, and unequivocal and appeared to arise out of a misunderstanding of the law. Therefore, the court will not permit intervention at this time.

However, because of the apparent position taken by Mr. Eaton and in part those taken by the sheriff and assessor, this court does not see fit at this time to terminate all thought of intervention by the taxpayers as prayed in their petition. Therefore, the order will provide that the taxpayers may reinstitute their proceedings to intervene at any time by merely filing a motion to reset their petition to intervene upon the calendar of the court, and this court will expect the district attorney, the sheriff and the assessor to keep the attorney for the interveners fully informed as to the preparation and plans made for prosecution of this appeal. Furthermore, the court will permit the attorney for the interveners to join the district attorney at counsel table, to be fully apprised of the proceeding as it progresses, and otherwise to be in a position to make such motion at any time.

Turning, lastly, to the motion for dismissal filed by Coos Bay Timber Co., the record shows that, upon the rulings made by this court upon the motion to dismiss and the petition to intervene in the Strawn case, the Coos Bay Timber Co. has seen fit to withdraw its motion to dismiss its case. The court grants permission for such withdrawal. Furthermore, counsel for Coos Bay Timber Co. has asked that the Coos

Bay Timber Co. case be held in abeyance pending a determination in the strawn case. This request likewise has been granted.

With the preparation of, and entry of, an order in conformity with this decision, the preliminary matters presented on March 30, 1962, are determined.

### DECISION ON THE MERITS

John M. Eaton, District Attorney, Coos County, Coquille, tried the case and submitted a brief for plaintiff.

A. W. Pedersen, Assistant Attorney General, Salem, tried the case and submitted a brief for defendant.

John B. Crowell, Jr., Portland, tried the case and submitted a brief for intervener defendant.

Decision rendered November 7, 1964.

PETER M. GUNNAR, Judge.

This is a suit brought by the sheriff and the assessor of Coos County to set aside the determination of the State Tax Commission by its opinion and order No. VL 61-322 reducing the ad valorem property tax assessment against certain railroad rolling stock and other equipment of defendant Coos Bay Timber Co. in Coos County for the year 1960. By its answer and counterclaim, defendant Coos Bay Timber Co. seeks a further reduction of that assessment.

On January 1, 1960, defendant Coos Bay Timber Co. (hereinafter called "CBT"), a wholly-owned subsidiary of Georgia-Pacific Corporation, owned in Coos County the railroad equipment in controversy in this suit and for the personal property tax year 1960 it was assessed at the fair market values shown below as "county" values. These valuations were duly appealed by CBT to the Coos County Board of Equalization and that board affirmed the valuations determined by the assessor.

From this decision, CBT duly appealed to the defendant State Tax Commission (hereinafter called the "commission"), a hearing was had before a commission hearing officer, and the hearing officer recommended to the commission a modest reduction. Many months elapsed while the commissioners considered the hearing officer's report. Finally, the commission entered its opinion and order here contested, reducing the valuations very substantially to the amounts shown below as "STC" values.

Thereafter, Strawn, the Coos County Sheriff, and Flanagan, the Coos County Assessor, duly sought to set aside that commission determination in this proceeding, exercising for the first time the new rights of court redress made available to county officials under the Oregon Tax Court Act. In its counterclaim, CBT continued to seek even lower valuations in the amounts shown below as "CBT" values.

The valuations and properties in controversy here are as indicated on the following page:

## ISSUES

The issue before this court is the value of this personal property for tax purposes, but involved in the determination of this broad question are other questions of both tax law and the law of evidence. This is the first property tax case before this new court, as well as the first such case brought by a county official. To be decided, therefore, either expressly or impliedly, is the scope of the judicial review which is available in this court. Secondly, the code sections concerning property tax cases were substantially modified by the 1961 Legislature and such problems as burden of proof, quantum of proof, and presumptions

| Item | COUNTY Unit Value | COUNTY 1960-61 | STC Unit Value | STC 1960-61 | CST Unit Value | CST 1960-61 |
|---|---|---|---|---|---|---|
| One Steam locomotive #11 1930 | $ | $ 6,000 | $ | $ 6,000 | $ | $ 3,500 |
| One Steam locomotive #10 1931 | | 6,000 | | 6,000 | | 3,500 |
| One Steam locomotive #9 1935 | | 2,000 | | 2,000 | | 850 |
| One GMC diesel locomotive | | 105,381 | | 105,381 | | 85,000 |
| One GMC diesel locomotive | | 105,381 | | 105,381 | | 85,000 |
| One GMC diesel locomotive | | 105,381 | | 105,381 | | 85,000 |
| Two cabooses | | 14,106 | | 14,106 | 3,150 | 6,300 |
| 19 44' Log skeleton cars AB brakes, Bettendorf trucks | 1,750(1) | 33,250 | 800(2) | 15,200 | 750 | 14,250 |
| 90 44' Log skeleton cars K brakes | 1,750(1) | 157,500 | 800(2) | 72,000 | 650 | 58,500 |
| 249 44' Log skeleton cars | 1,500(1) | 373,500 | 600(2) | 149,400) | 149,500 | 74,500 |
| 8 60' Log skeleton cars | 1,500(1) | 12,000 | 600(2) | 4,800 | 100,400 | 40,000 |
| 5 24 cu. yd. gravel cars, steel hopper | 2,000 | 10,000 | 2,000 | 10,000 | 1,100 | 5,500 |
| | | 750 | | 750 | 750 | 750 |
| 1 wood deck steel frame flat car | 750 | 3,000 | 750 | 3,000 | 500 | 2,000 |
| 4 wood deck wood frame flat cars | | 2,600 | | 2,600 | | |
| 1 all steel moving car | | 2,600 | | 2,600 | 1,300 | 1,300 |
| 3 8000 gal. crude oil cars | 2,400 | 7,200 | 2,400 | 7,200 | | |
| 2 8000 gal. water cars | 2,400 | 4,800 | 2,400 | 4,800 | | |
| 4 10,000 gal. diesel fuel cars | 2,500 | 10,000 | 2,500 | 10,000(3) | 3(a) | 8,075 |
| 1 12,000 gal. diesel fuel car | | 2,600 | | 2,600) | | |
| 1 4,000 gal. diesel fuel car | | 1,750 | | 1,750) | | |
| 1 diesel locomotive crane | | 24,915 | | 24,915 | | 22,500 |
| Pile driver attached buckets & boom | | 3,800 | | 3,800 | | 3,500 |
| 4 push cars | 100 | 400 | 100 | 400 | 100 | 400 |
| 3 speeders for section crew | 400 | 1,200 | 400 | 1,200 | 250 | 750 |
| 4 20-,an speeders, V-8 motors | 1,000 | 4,000 | 1,000 | 4,000 | 600 | 2,400 |
| 1 diesel 40-man motor car | -- | -- | -- | -- | -- | -- |
| **TOTAL VALUE** | | $997,514 | | $662,664 | | $507,575 |

3(a) detail:

| Qty | Base | 3(a) | Total |
|---|---|---|---|
| 5 | 8,000 | 650 | 3,250 |
| 1 | 8,000 | 750 | 750 |
| 1 | 10,000 | 725 | 725 |
| 1 | 10,000 | 850 | 850 |
| 2 | 12,000 | 950 | 1,900 |
| 1 | 4,900 | 600 | 600 |
| | | | 8,075 |

Total of (1) $575,250 
Only values changed (2) 
Total of (2) $241,400 
Total of 3(a) $8,075 
Total of (3) $26,350

must be considered, or reconsidered, expressly or impliedly, in any analysis of the extensive record made in this case.

Thirdly, the particular nature of the property in question and its declining utility in today's lumber business forces a consideration of the full meaning of the definition of true cash value contained in ORS 308.205. In its fundamentals, this case does not arise solely out of the usual disagreement of experts on value, but rather it goes much deeper, to the very meaning of value. Did the property have a "market value"? In this sense, what is a "market value" or a lack of "market value"? If it did not, then, at what value should it be assessed? What is the meaning of "the amount of money that would justly compensate the owner for the loss of the property" and "value to the owner"?

All these questions are placed squarely before the court in this case and must be decided by it to the full extent of its powers to do so.

## FUNCTION OF THE OREGON TAX COURT

The Oregon Tax Court Act (Oregon Laws 1961, ch 533) made far-reaching and fundamental changes in the purpose and scope of judicial review of property tax assessments. It culminates a legislative effort to overcome judicial reluctance to assume responsibility in the technical and complex field of taxation. A full understanding of its significance requires a study of the legislative and judicial history of both the scope of court review of tax cases and the required quantum of proof, as the two are bound together in both the decisions and the statutes.

## HISTORICAL REVIEW

A historical analysis of the function of the judiciary in taxation shows clearly the interplay of those social, economic, and political factors which form the general outline of Oregon's history. The positions taken by the courts and the legislature at various times were influenced as much by the conditions then extant as they were by any far-reaching legalistic concept or philosophy. As the underlying conditions changed, so did the law as pronounced by the courts, and these decisions of the courts faithfully mirror the change which lies beneath them.

Viewed in broad outline, two directional forces, each with a different perspective, interact upon the surface of the changing conditions. The one is the legislature. Since the earliest period, the Oregon Legislature has viewed the courtroom as the proper place in which to determine serious tax disputes. At every opportunity, it has sought to enlarge the judicial function, expressing thereby its belief in the taxpayer's right to his day in court and its fundamental and justified faith in the judicial process in Oregon. On the other hand, aware of the limitations of the adversary, judicial proceeding in complex cases, the judiciary has sought to maintain court review to limits within which the courts could operate effectively.

The history of judicial review divides itself into three periods: The first period from 1859 to World War I, when full judicial review was taken for granted, the second period from 1917 through the late 1940's, when, despite legislative actions to the contrary, the court severely limited judicial review and almost completely retreated from the field, and the third period from 1950 to the present, when the legislative and

professional leaders sought to expand the judicial review to the full limit by removing the conditions which justified the contraction which the court had made in the second period.

### The Full Review of the First Period

■ The first period actually goes back beyond statehood. In a pioneer community cut off from the centers of business and population, the financial demands of Oregon government were small indeed and taxes did not constitute an appreciable part of the cost of living or doing business. Much of our earliest government and law enforcement was federally financed. For local purposes, only the most modest fiscal machinery was needed. The first statutes concerning the review of tax assessments provided for a board of equalization composed of the county assessor and clerk, expanded in 1870 to include the county judge. Oregon Laws 1870, §§ 1-4 of October 25. No provision was made for judicial review.

Nonetheless, under the common law adopted in Oregon from territorial enactments, the courts recognized their inherent jurisdiction over tax matters, both at law and in equity. In 1888, Mr. Justice STRAHAN discussed fairly completely both the legal and equitable remedies in taxation, in *Oregon and Washington Mortgage Savings Bank v. Jordan,* 16 Or 113 (1888), in which, at 116-17, he said:

"2. As a general rule, equity has nothing to do with the correction of erroneous assessment. Aside from the requirements of the statute, public policy requires that the revenues should be promptly assessed, and collected by those officers and through those agencies which the law has specially provided for that purpose. Unless, therefore, a case can be

brought by its particular and peculiar facts under some one of the heads of equity jurisdiction, such as the preventing a multiplicity of suits, removing cloud from title, or the like, equity will not ordinarily interfere unless the tax be illegal. The remedy prescribed by statute in most cases will be found ample and expeditious, and in such cases it ought to be exclusive. Burroughs on Taxation, Section 102, states the rule thus: *'Errors, what tribunal corrects.* Where the assessors have jurisdiction of the persons or property assessed, they act judicially, and like the judgment of any other tribunal, their acts are conclusive until reversed in the mode prescribed by law. Whether the error be in the valuation of property at too high a rate, or upon a wrong principle, or of property which is claimed as exempt, the decision of the assessor cannot be attacked collaterally. The remedy is by appeal to that tribunal provided by statute, and if there be none provided, then it is by *certiorari.'* And this principle seems to be supported by many authorities. [Citations omitted.]

"3. This court held, in *Rhea v. Umatilla Co.,* 2 Or. 298, that the assessor and clerk constituted a *tribunal,* whose decision might be reviewed by proceedings taken for that purpose under section 573 of the Code as it then stood. In that case the court further said: 'The clerk and assessor sit as a tribunal after public notice has been given that they will then make an adjustment of valuations, and any aggrieved property holders ought to appear and seek redress for *wrongful* or *improper assessment.* When they do so seek a correction and are not satisfied with the decision, the law provides no other remedy, but to avail themselves of the writ of review, and that, too, within six months after the decision.' And *Poppleton v. Yamhill Co.,* 8 Or. 338, is to the same effect."

■ This writ of review, which is the direct precursor of the statutory remedies that followed, "is sub-

stantially the common law remedy by *certiorari.*" *Dayton v. Board of Equalization,* 33 Or 131, 139, 50 P 1009 (1897). From the quotation from Burroughs on Taxation, it seems that the writ was understood to open the record to the review of all determinations by the board of equalization.

Though this appears to have been the understanding during the last half of the nineteenth century, it was in error. Much confusion has existed over the years as to the scope and function of the writ of review. This confusion was not finally laid to rest until Mr. Justice LUSK's opinion in *Bechtold v. Wilson,* 182 Or 360, 186 P2d 525, 187 P2d 675 (1947), which in large measure, confirmed the earlier decision of Mr. Justice BEAN in *Garnsey v. County Court,* 33 Or 201, 205-7, 54 P 539, 1089 (1898). These cases restrict the writ of review to two very limited functions. At 206-7 of *Garnsey v. County Court,* the court said of the writ:

> "\* \* \* Its object, under the statute, as at common law, is to keep inferior courts and tribunals within the bounds of their jurisdiction, and compel them to proceed regularly in the disposition of matters brought before them for determination; but it cannot be used as a substitute for an appeal, nor does it lie to correct mere errors in the exercise of rightful jurisdiction, or to inquire whether the rulings of the inferior tribunal upon the law and the evidence, and in the application of the law of the facts, are correct." [Citations omitted.]

In the field of taxation, the effect of this decision was to limit severely the court review which theretofore had followed the broad outline of Burroughs and *Oregon and Washington Mutual Savings Bank v. Jordan, supra.*

■ Although the *Garnsey* case was not a tax case, although its full and far-reaching effect and that of its companion, *Dayton v. Board of Equalization,* 33 Or 131, 50 P 1009 (1897), was not fully understood, and although subsequent Supreme Court decisions did not invariably follow the rules laid down in those two cases, as noted by Mr. Justice Lusk in *Bechtold v. Wilson, supra,* the legislature, as early as 1907, broadened the tax appeal process by providing specifically for an appeal from a decision of the board of equalization to the circuit courts. Oregon Laws 1907, ch 266. This new appeal was summary in manner, exclusive, and equitable in nature, and vested the court with broad powers to review not only value but also the fairness and good faith of the assessment. The writ of review procedure was not repealed and the court soon held that the statutory appeal was in addition to, rather than in place of, the writ of review and that the right of appeal did not extend or broaden the subject matter before the court upon a writ of review. *Elmore Packing Co. v. Tillamook County,* 55 Or 218, 221-2, 105 P 898 (1909), citing *Garnsey v. County Court, supra.* The court review set forth in the 1907 act was continued in Oregon Laws 1913, ch 184, § 8, and broad judicial review continued until the beginning of the second period.

### The Period of Judicial Contraction, 1917-1953

The second period began in 1917 with the decision in *Weyerhaeuser Land Co. v. Board of Equalization,* 85 Or 434, 165 P 1164 (1917). Since the 1890's, Oregon's society had grown more complex. While taxes still were not the heavy burden that they are today, nonetheless, the industrial empires were growing, individual tax cases were of enough import to cause seri-

ous financial problems to government, and the demands
of government were on the rise. Yet the machinery of
taxation did not keep pace with the demands made
upon it. Until 1929, the property tax was the prime
source of revenue. There was no equalization on a
state-wide basis. True cash value was an occult term
understood in practice only by the local assessor.
Though not as bad as they later became, the condi-
tions in 1917 were beginning to forecast the almost
hopeless situation to come. These were not conditions
under which courts could operate effectively. The
only effective solution, as the confusion worsened,
was a statewide ratio and reappraisal program, which
did not come to pass until the 1950's. In the mean-
time, the courts were faced with having to operate
under these conditions.

■ Beginning with the *Weyerhaeuser Land Co.*
case, *supra,* and culminating in the landmark case of
*Appeal of Kliks,* 158 Or 669, 76 P2d 974 (1938), the
courts invoked the doctrine of separation of powers, the
presumption of assessment validity, and other concepts
to limit the scope of the practical effect of judicial
review so as not to go beyond the capabilities of the
judicial system. The only other alternative would have
been to attempt judicially the remedies which the
legislative and administrative arms of government
finally invoked in the 1950's. That this period of limi-
tation and withdrawal coincided with the period of
tremendous growth of administrative law in America,
when all along the line the courts retreated before
the onslaught of burgeoning bureaucracy in all its
alphabetical proliferation, merely added impetus and
a philosophical basis to the trend already established
upon firm grounds of local conditions.

The first, and ultimately the most effective, means of limiting judicial review was the increasing emphasis of the presumption of assessment validity and the increasing of the proof necessary to overcome it. It began in *Weyerhaeuser Land Co.* case, *supra,* when the court said (at page 443):

"3. It appears to be a firmly established rule that the valuation placed upon property by the Assessor for the purpose of taxation is *prima facie* correct, and a party assailing such an assessment as excessive must make it clearly appear that the assessment does not represent the fair value of the property assessed: *Steel v. Fell,* 29 Or. 272 (45 Pac. 794); *Oregon Coal etc. Co. v. Coos County,* 30 Or. 308, 310 (47 Pac. 851); *Southern Oregon Co. v. Coos Co.,* 39 Or. 185 (64 Pac. 646); *Elmore Packing Co. v. Tillamook County,* 55 Or. 218, 222 (105 Pac. 898); *Northern Pac. Ry. Co. v. Clatsop Co.,* 74 Or. 250, 256 (145 Pac. 271); *People v. Davenport,* 91 N. Y. 581; 37 Cyc. 1069, 1104 et seq."

All the Oregon cases cited by the court in this case, with the exception of *Elmore Packing Co. v. Tillamook County, supra,* and *Northern Pac. Ry. Co. v. Clatsop Co., supra,* were decided prior to the 1907 enactment and merely affirmed the presumption. The *Elmore* case discussed the applicability of the writ of review. The *Northern Pac. Ry. Co.* case dealt with the evidence necessary before the board of equalization to warrant action by the circuit courts.

The *Weyerhaeuser* case was followed a year later by *Douglas Land Co. v. Clatsop County,* 87 Or 462, 464, 169 P 790 (1918), in which the extent of judicial review was given an equally brief but pertinent and limiting treatment; as follows:

"* * * The question to be determined is whether the assessment conforms to the actual cash value

of the property. The statute has been twice construed by this court and it is held that the error of the assessor must be made clearly to appear: [citing *Northern Pac. Ry. Co.* case and the *Weyerhaeuser Land Co.* case, both *supra.*]."

The remedy of a direct appeal from the board of equalization to the circuit court continued in Oregon until 1929, when the legislature adopted a procedure of appeal from the board of equalization to the State Tax Commission and from the State Tax Commission to the circuit court. Oregon Laws 1929, ch 465. This new statute did not expressly repeal the earlier appeal from the board of equalization to the circuit court, but *Columbia River-Longview Bridge Co. v. Wellington,* 140 Or 413, 13 P2d 1075 (1932), held the direct appeal to be repealed by implication.

The 1929 act did not put any limit upon the scope of review by the circuit court, but, nonetheless, it was under this 1929 act that the severe limitation of the judicial function in tax cases reached its high point in *Appeal of Kliks, supra.* In this opinion, Mr. Justice ROSSMAN rejected the idea that the court had any reassessment function and, relying upon the presumption and the separation of powers, he limited the scope of review to the single question of uniformity and required a greater degree of proof—that normally required for fraud—to overcome the presumption. His reasoning is clearly set forth at pages 687-8:

"Since error is never presumed, the appealing taxpayer has the burden of proof, and since courts always presume, in the absence of evidence to the contrary, that official duty has been properly performed, the appealing taxpayer is met with a presumption of official rectitude. The latter is not a mere legally created makeweight, but is based upon

the assessor's superior knowledge of the property of the appellant and of all other property in the district. For the court to acquire like knowledge of values would require extended study. Knowledge of the protesting taxpayer's property alone does not suffice—uniformity requires knowledge of every parcel of property in the assessment district. Invalidation of a single assessment may operate as the loosing of a stitch which causes the entire fabric to ravel. These circumstances have impelled courts to attach weight to the presumption that the assessor faithfully performed his duty. Clear and convincing evidence is required to overcome it. Again much of the work of the assessor is nonjudicial and the doctrine of separation of powers, a practical device for the division of labor, induces courts to hold aloof except where the assessor has ignored his constitutional and statutory duties, inadvertently or otherwise."

Almost immediately following the opinion in the *Appeal of Kliks, supra,* the 1939 Legislature again amended the appellate process. Contrary to the interpretation of *Wadhams & Company et al v. State Tax Commission,* 202 Or 132, 273 P2d 440 (1954), it sought to expand upon this judicial limitation, rather than contract judicial review, by allowing the court to consider value as well as mere uniformity. Oregon Laws 1939, ch 490, § 3, provided in subsection 3, in part:

"* * * but if the court finds that the assessment was made at a greater sum than the true cash value of the property, or that such property was assessed disproportionately to other properties in the county, it shall set aside such assessment and determine the correct assessed valuation thereof * * *."

The court considered and declared the import of the 1939 statute in a number of cases of which the

leading cases were *In re Gebauer's Apartment,* 170 Or 47, 131 P2d 962 (1942) and *Wadhams & Company et al v. State Tax Commission, supra.* Again the emphasis of the decisions was upon limiting the effective scope of the review. In the latter case, the court quoted the former as saying (202 Or 136):

> " 'By the 1939 amendment only two questions are left open for consideration by the courts, to wit: (1) Was the property involved assessed at a greater sum than its true cash value? And (2) was the assessment reasonably proportionate to the assessed valuation of *similar* property in the county?' (Italics added.)"

In *Inland Navigation Co. v. Chambers,* 202 Or 339, 274 P2d 104 (1954), the statute was interpreted as prohibiting the court from considering the issue of situs of the property.

It should be noted that throughout this period, the basis for the limitation of judicial review was strengthened by the statutes which clearly provided that the review should be "in a summary manner" (Oregon Laws 1907, 1929, 1939), though they appeared to give the court equity powers by providing that the case be heard as a suit in equity (Oregon Laws 1909, 1939).

Finally, in 1953, the legislature undertook a comprehensive amendment of the judicial review statutes. Oregon Laws 1953, ch 708. This statutory change marks the beginning of the third and present period.

Before considering this third period, the *Appeal of Kliks, supra,* and its meaning in the conditions of the times must be more fully explored, because before this decision, the law largely drifted until this decision was the only logical conclusion. Then, after it was

fully understood and other decisions, which have extended into this third period, carried its logic to the ultimate result, this decision was the beacon which pointed the way into this present period and spotlighted the statutory and administrative changes necessary before full judicial review could be undertaken properly.

Certainly in the tax field, and perhaps in the entirety of Oregon law, no decision has been more frequently cited than this opinion in *Appeal of Kliks*. It has been a steady Polaris to which the judges have looked for certainty when storm-tossed or befogged upon this alien and often uncharted sea.

*Salum ut inter ista certum sit nihil esse certi.*

The law must change as conditions change. The conditions which justify a given rule of law, when they change, do not leave immutable the vestigial rule of law. Rather the law applies the sound reasoning which gave rise to the rule to the changed conditions and restates the rule of law in the light of the changed conditions. Thus, in applying a great decision such as *Appeal of Kliks,* it is not enough to parrot its rules without understanding. Instead, the conditions upon which it was based must be understood and related to today's conditions. Then the rational basis for the decision must be applied to the present conditions.

The *Appeal of Kliks* was written in 1938. By then, taxation had assumed almost the position in our economy, personal and business, that it has today. The great depression had placed tremendous demands upon government and many more were ahead. Yet little had been done to strengthen the administration of ad valorem taxation in Oregon. Once assessed, a property

often remained unchanged for decades. Assessors rarely did more than add new assessments to the roll. Ratios varied greatly and generally were very low. To find a property's value was only the first step in reaching equitable assessment. The next was virtually impossible, that of determining the relation of that value to the value of other property in the county. In some areas, the measure of assessment was what the traffic would bear. Assessment was a crazy-quilt of county-by-county injustices and evasions. That a court determination of true cash value could "operate as the loosing of a stitch which causes the whole fabric to ravel," as Mr. Justice ROSSMAN noted in *Appeal of Kliks,* is commentary enough on the precarious state of ad valorem taxation. When this confusion was compounded by the greatly increased burden of government spending, the reasons for judicial reluctance to invade the field that existed in 1917 were increased in magnitude one-hundred-fold by 1938.

In 1929 the State Tax Commission had been given review authority over board of equalization assessments. Here was a body with the administrative staff and powers capable of bringing some order out of the chaos. Until such order appeared, there was no real alternative for the courts but to leave the remedy in the commission's hands, with only the vaguest sort of control over its abuses, if any.

That this course should be pursued was in line with the course of the law in all areas. The nine years intervening between the 1929 act and *Appeal of Kliks* saw the tremendous growth of administrative law. In many fields the courts were withdrawing from fact-finding functions to cluster about the embattled remains of hallowed constitutional concepts. In no field

was this tendency more marked than in taxation. At the same time, taxation was becoming infinitely more complex.

Finally, the same retreat from taxation was occurring in the legal profession generally. This meant that the expertise necessary to present in court the complex issues of taxation was vesting in laymen who operated outside the court system.

■ Under these conditions, with only a summary hearing before a circuit judge, "whose duties," as Mr. Justice ROSSMAN had earlier pointed out in *Columbia River-Longview Bridge Co. v. Wellington, supra,* at 419, "compel him to scatter his efforts among a variety of problems," the only recourse was to narrow the scope of inquiry to flagrant abuse of fundamental justice—of uniformity.

Yet all the while the legislature was concerned with the other side of the problem. It did not want to let the taxing authorities, who had the responsibility for raising the revenue, be both judge and jury in their own cases. In every act from 1907 onward, the legislature sought to strengthen and broaden the judicial function. Then in 1953, and finally in 1961, using *Appeal of Kliks* and other decisions based upon it as its guidelines, the legislature met the problems which had caused the limitations of judicial review and the scope of review was broadened to its present status.

### The Third Period: The Act of 1953

■ The third period, the road back to the full vesting of the judicial function of adjudication in the judiciary, began with the 1953 act. Oregon Laws 1953, ch 708. This act coincided with the legislative and administrative efforts to obtain state-wide uniformity in as-

sessment and a professionalization of assessment personnel. In reality, the 1953 act did not attain the final goal but was merely a step in the desired direction, the biggest step that conditions would permit.

It provided in detail for the property tax appeal to the circuit court in the county where the property was located. Section 11 provided:

> "Section 11. (1) The review shall be conducted by the circuit court without a jury and shall be confined to the record before the court, except that in cases of alleged irregularities in procedure before the commission, testimony thereon may be taken in the court. The findings and order of the commission shall carry a prima facie presumption of validity, and the court may affirm the order of the commission, or may reverse, modify or remand it if the substantial rights of the petitioner have been prejudiced.
>
> "(2) In case of modification, reversal or remanding by the circuit court, the court shall make special findings based upon the evidence in the record indicating clearly all respects in which the commission's order is erroneous."

The act also provided for an appeal of the supervisory orders of the commission issued under what is now ORS 306.090 and 306.130, directly to the circuit court of the county in which the property affected is located and went on to provide in Section 1, subsection (4):

> "(4) Appeals shall be heard and determined by the court in a summary manner as a suit in equity, except as provided in this section. The court may affirm the order or direction of the commission or may reverse, modify or remand it to the commission. In case of reversal, modification, or remanding, the court shall make special findings indicating clearly all respects in which the commission's order is erroneous."

This statute removed any limitation upon the questions open to review in the circuit courts. Yet, by expressing a *prima facie* presumption of validity as to the commission's order, by requiring that the substantial rights of the petitioner must have been prejudiced, and by requiring special findings, the legislature left statutory pegs upon which a serious circumscription of the court's power and latitude in review could be hung.

There followed a period of testing and of change from 1953 to 1961. Both the statute and *Appeal of Kliks* were invoked and a serious effort was made to mold them into a single, unified concept. In the process, the defects of the 1953 act were discovered and judicially pointed out.

The first opinion which discussed the 1953 changes in property tax appeals is that of Mr. Justice KESTER in *Case v. Chambers,* 210 Or 680, 314 P2d 256 (1957). At page 695, he said:

"Unlike § 110-610, OCLA, which preceded it, the present statute does not limit the questions open to court review. See *In Re GeBauer Apts.,* 170 Or 47, 49, 131 P2d 962. Nor does the present statute continue the former provision that in the event of overvaluation or disproportion, the court 'shall set aside such assessment and determine the correct assessed valuation thereof.' Under that provision (and similar language in ORS 308.630) it was held that the court did not step into the shoes of the assessor, but merely reviewed the evidence to determine whether the taxpayer, in attacking the assessment, had produced evidence to overcome the presumption that the assessor had properly performed his official duties. Compare the language of Mr. Justice Brown's specially concurring opinion in *Smith Securities Co. v. Multnomah County,* 98 Or 418, 427-31, 192 P 654, 194 P 428, with *Appeal of*

*Kliks,* 158 Or 669, 686, 76 P2d 974, and *Tax Commission v. Consumers' Heating Co.,* 207 Or 93, 110-112, 294 P2d 887.

"1. While the scope and manner of review under the present statute are not free from doubt, in the absence of a more specific direction, we construe the 'prima facie presumption of validity' mentioned in ORS 306.555 as the equivalent of the presumption of official regularity which was applied under the former statute. And the provision empowering the court to 'affirm * * * reverse, modify or remand' permits the court itself, in the event the presumption is overcome, to determine the correct assessment, if the record is sufficient, or to set aside the additional assessment altogether, or to remand it to the commission for correction in the light of such guiding principles as the court may lay down."

*Case v. Chambers* was reasonably explicit, and for some time received nothing more than note and repetition in subsequent Oregon cases. For instance, in *Oregon Worsted Co. v. State Tax Commission,* 217 Or 104, 117, 317 P2d 924, 342 P2d 108 (1959), the court noted that in an appeal the circuit court may affirm, modify or remand, and went on to discuss the problem of burden of proof upon the remand. In that case and in the consolidated cases of *M & M Woodworking Co. v. State Tax Commission* and *Crown Zellerbach Corporation v. State Tax Commission,* 217 Or 161, 314 P2d 272, 275, 317 P2d 920, 925, 339 P2d 718 (1959), the court discussed whether or not equity or law procedures upon appeal to the Supreme Court would apply, and decided that an appeal in a tax case proceeds as a case in equity, with no requirement for bill of exceptions. In this latter case, the court restated the rule of *Appeal of Kliks, supra,* that the burden upon a tax-

payer in upsetting the original assessment of the assessor must be met by evidence that is clear and convincing. At page 175, the court ended:

> "* * * The trial in the circuit court on the 'issues in the case' is confined to the record before the court as made in the hearing or hearings before the tax commission. It is upon that record that the circuit court makes special findings. No evidence is taken in the circuit court upon those or any issues except that testimony may be taken in court in cases of alleged irregularities in procedure before the commission. The effect which this court shall give to findings of the circuit court or to the findings of the commission which carry a prima facie presumption of validity is a matter within the control of the legislature subject only to constitutional limitations. * * *"

The presumption was again commented on in *Georgia Pacific Corporation v. State Tax Commission,* 228 Or 112, 363 P2d 1104 (1961) and *West House, Inc. v. State Tax Commission,* 228 Or 167, 364 P2d 598 (1961). These cases showed the problem of emphasis created by inclusion of the presumption in the statute.

In *Johnston v. State Tax Commission,* 218 Or 110, 342 P2d 799 (1959), the court discussed the adequacy of the remedy provided by statute. In this case, a taxpayer sued to quash a proposed assessment. The court held that the remedy as set forth in the statute, as a remedy at law, was adequate, speedy, and complete.

As late as 1960, the court was applying to this broad review statute the heavy quantum of proof required in *Appeal of Kliks* and trying to arrive at some consistent position. Actually, it was moving away from a broad review rather than toward it. In *Rose-*

*burg Lumber Co. v. State Tax Commission,* 223 Or 294, 335 P2d 606 (1960), the court stated (at page 312):

"7, 8. Still a further reason for the requirement that the commission, or any other administrative agency, state its reasons for reaching a decision which will be subject to judicial review is to prevent a judicial usurpation of the administrative authority. It is settled law that the administrative decisions of boards and commissions acting within their authority are entitled to persuasive force upon judicial review. See, for example, the cases cited in *Jehovah's Witnesses v. Mullen, et al,* 214 Or 281, 330 P2d 5, appeal dismissed 359 US 436, 79 S Ct 940, 3 L Ed2d 932. But an incomplete statement of the method used to reach a vital administrative decision which affects the substantial property rights of citizens is an open invitation to a judicial effort to arrive at a different result. This court does not intend to substitute its judgment for that of the commission. The order will not be revised in court; it is either valid or it is void. The trial court having found that the commission was arbitrary, the order was held to be void. We concur. * * *"

That this movement toward restricted judicial review was contrary to the legislature's intent became evident with the 1961 act. In the meantime, and most important in view of the rationale of *Appeal of Kliks,* the whole fabric of our tax system underwent drastic rejuvenation at legislative direction. Under able tax commissioners, a state-wide reappraisal program was undertaken and at this writing is almost complete. The 1955 Legislature amended ORS 308.305 so that by 1961 true cash value was made to equal market value. County ratios were raised to uniform 25 per cent. All these efforts were directed to having every piece of taxable property in the state valued and assessed on

the same basis—25 per cent of fair market value. Along with this program went an intensive program of training and certification of appraisers and extensive supervisory control by the commission.

While these changes were taking place and long before, a change in the attitude of the legal profession was taking place. More and more lawyers were specializing in taxation, thereby supplying the need for skilled and expert advocates to make the adversary proceeding effective. Today, all lawyers recognize the importance of taxation and the tax bar has expanded to meet the needs of the citizens and the courts.

By 1961, through the combined effort and foresight of the legislators, the commission, and the county officials, Oregon had stepped to the forefront of the states in the administration of ad valorem taxation. The time had come for the processes of judicial review to be brought to the advanced position of tax administration generally.

### Oregon Tax Court Act

During these years of transition, the legislature and others interested in full judicial review had given great study to the court's opinions. They recognized the validity of much that the court had said in keeping a short rein on judicial review, but they also realized the need for a full, impartial, judicial review to which the already heavily burdened taxpayer could resort when he believed that he was unjustly taxed. To give the taxpayer such a full, impartial, judicial resort, while curing the defects and solving the problems in such a broad review already pointed out by the court, was the problem. To this problem were brought the finest tax-oriented minds of both the legal and accounting professions, under the leadership of the Oregon

State Bar and the Oregon Society of Certified Public Accountants. Senator Ben Musa, a CPA, chairman of the Senate Committee on Taxation, and a long-time proponent of a tax court, was the sponsor of the 1961 bill, as well as its predecessors, and he both aided in its preparation and engineered its passage. The act was not the product of laymen legislators but rather of technically trained and astute professional draftsmen.

The features of the act itself show great care in its drafting. To avoid the implication of limited review previously found in the legislative recognition of the presumption of assessment validity, the language of the 1953 act was omitted so as not to give the presumption added import by statutory expression as had occurred under the 1953 act. To avoid the problem which Mr. Justice ROSSMAN noted in *Columbia River-Longview Bridge Co. v. Wellington, supra,* at 418-19, and which runs through *Appeal of Kliks* and many of his other opinions:

> "* * * Likewise a board of three commissioners whose principal qualification consists of expert knowledge of tax matters and who confine their daily duties to consideration of tax problems might assess a piece of property for tax purposes in an amount substantially different from that of a circuit judge whose primary qualification consists of his legal training and whose duties compel him to scatter his efforts among a variety of problems. * * *"

the act creates a specialized or expert court of circuit court status designed to sit throughout the state. It concentrates the tax court judge on tax problems alone and in its appointment provisions it seeks to influence the governor to choose a tax-qualified lawyer.

Previous acts had made the review "summary" in manner, had based it upon the commission record, had referred to the pleadings as "petitions," and had otherwise used language and procedures which led the court to interpret the review as similar to one upon a writ of review, an appeal, or one upon *certiorari*. To avoid such interpretations, the 1961 act provides that the practice and procedure of equity, the broadest of judicial forms, shall apply, that the pleadings are a complaint, and presumably an answer and a reply, and that the limitations of ORS 306.555 are repealed in their entirety. It converts the proceeding into an independent suit rather than an appellate review. Because the opinion in *Case v. Chambers, supra,* interpreted the power to "affirm * * * reverse, modify, or remand" as permitting the court the widest latitude of disposition, the 1961 act retains this phrase exactly.

In addition, the act makes *de novo* the proceeding in this court and repeals the statute directing that the case goes up on the commission record. Thus what record is made must be made *de novo* in this court. Under this procedure, the record below is not reviewed for jurisdiction, sufficiency, or any other question. The only record on appeal is the one made before this court and it is upon this record that the case must be decided. This conversion to a plenary, *de novo* proceeding precludes any limitation on the scope of the inquiry other than the statutory limitation to the issues raised before the commission. This statutory limitation itself implies that no other is contemplated. This is not a court acting in a summary manner while concerned with many varied legal problems, but rather is an expert court limited to the field of taxation and acting upon a full trial, plenary and *de novo*.

Finally, the problem is no longer the problem of assessing the whole county faced in *Appeal of Kliks*. The reappraisal program has reduced the issue to the fair market value of the subject property. The assessor is presumed to do his duty, to appraise all property at fair market value and to apply the statutory ratio. Thus, if the property is assessed at 25 per cent of fair market value, it is equal and uniform with all other property (except in the counties where the ratio has yet to be reduced to 25 per cent). Because of the reappraisal program, the problem has been reduced to one cognizable in a court. Every day, like problems in condemnation and property damage cases are decided in courts throughout the land. This court is no less capable of deciding these questions than a circuit court or a circuit court jury.

Nor is there any longer the danger of ravelling the delicate fabric of property tax assessment by full judicial inquiry, as there was when *Appeal of Kliks* was written. Here again the uniformity required by the statute and accomplished by reappraisal makes the court's correction of an assessment an aid to uniformity rather than a threat to the over-all county program.

Clearly, from all these various features, the legislative intent in the adoption of the Oregon Tax Court Act was to confer on this court the broadest powers of determination and to give it the tools with which to exercise its jurisdiction properly. In culminating a long history of legislative action to broaden the function of the judiciary in the tax field, this court has been granted the power, based upon the evidence adduced before it, to determine the correct assessed value of the subject property, to determine the tax-

ability of property, and to determine all other questions inherent in the taxing process. In so doing, it can affirm the commission order, or it can modify it, or it can reverse it. If the record is insufficient or for any other reason, this court can remand the case to the commission. The proceeding before this court is plenary, not summary; it is an independent, *de novo* trial of the issues before the court, not merely a review of the record for error in procedure or jurisdiction; and now, as in other justiciable controversies, the litigant can obtain a full and complete remedy in taxation from an independent court exercising full judicial powers.

Such construction of this act and its underlying legislative intent reflects also the philosophic changes of the period. The great Chief Justice JOHN MARSHALL taught us that "The power to tax is the power to destroy." Our national forefathers protected our citizens from fiscal tyranny, from the threat of such destruction, by our constitutional system of checks and balances. The greatest of these is the effective reality of three equal and coordinate branches of government. The enhancing of their integrity, each in its own sphere, tends to perfect these checks and balances. The power to tax is as potentially a source of tyranny and destruction as it is essentially a requisite of the sovereignty of government. The continued and balanced exercise of this tremendous power, so essential for those necessary and desirable purposes served by our expanding government, requires, as perhaps never before, that an independent, coordinate judicial power stand between the ever diminishing strength of the individual and the immense potential for abuse inherent in the misuse, whether intentional or inadvertent, of the uncontrolled power to levy and collect taxes.

In the disturbed and disrupted decade of the thirties, our entire belief in the concept of checks and balances was eclipsed behind a hasty and single-minded reliance upon dynamic centralism. The resulting concentration of power in the federal executive reached its peak in the years of world strife. Following the readjustment and reconstruction of the late forties, the decade of the fifties brought forth a new understanding of the principles of balanced power and the strengthened coordination of primary instruments of governmental force and action. There has been a rededication to the philosophy of co-equal safeguards for individual freedom in a world requiring and accepting the continually increased, positive action of government at all levels. This rebirth of understanding, this rededication, has been no less profound in the recognition of the safeguards and values of the coordinated branches of government than it has been in the reaffirmation of federalism. Rockefeller, *The Future of Federalism,* New York, 1962.

In the forefront of this rejuvenation of the equal and coordinate nature of our branches of government, just as it has been in the implementation of effective federalism, has been the State of Oregon. No one branch of state government has assumed more leadership than any other. Rather, all have contributed equally, and nowhere is this more graphically portrayed than in this crucial field of taxation.

Oregon's creation of an independent tax court as part of the judicial branch of government is an expression of this change in our philosophical climate during the last two decades. Through the direction and guidance first given by the court in *Appeal of Kliks* and other cases, through farsighted legislative

impetus and understanding in providing the necessary statutory changes, and through capable and dedicated executive leadership in systematic reconstruction of the administration of taxation, the conditions for the necessary judicial review and protection in taxation have been vastly improved. The result of this improvement is that the judicial branch of Oregon government, in this new court, now is able to provide that independent, considered determination of justiciable controversies in taxation which, under our system of government, preserves in full measure the freedom of our citizens from fiscal oppression, regardless of how unintended. Through the efforts of all its branches of government, Oregon has achieved the practical reality of such judicial protection while preserving the full, sovereign, fiscal power of the state.

## BURDEN, QUANTUM AND PRESUMPTIONS

■ Much that this court said concerning the burden of proof, the presumption of assessment validity, and the quantum of proof in income tax abatement cases in *Sproul v. Commission,* 1 OTR 31 (1962) (CCH Oregon § 201-348) applies in this case.

### Presumptions

In the *Sproul* case, *supra,* this court distinguished the procedural presumption of official rectitude created by ORS 41.360(15) from the court-created, substantive presumption of assessment validity. This distinction is just as valid in the property tax case. Furthermore, both the presumption of assessment validity and the statutory presumption apply in property tax cases as clearly as they do in income tax abatement cases and for substantially the same reasons as those discussed at length in the *Sproul* case.

## When Presumption Attaches

Because the county assessor is an independent taxing official whose assessment is judicial in nature, the presumption attaches to the assessment as made by the assessor. *Knappton Towboat Co. v. Chambers,* 202 Or 618, 276 P2d 425, 277 P2d 763 (1954); *Weyerhaeuser Land Co. v. Board,* 85 Or 434, 165 P 1164 (1917); *Southern Oregon Co. v. Coos County,* 39 Or 185, 64 P 646 (1901). Even when the assessor's determination is modified by the commission upon a hearing, the presumption continues to attach to the assessor's finding upon judicial review of the commission order. *West House, Inc. v. State Tax Commission,* 228 Or 167, 178, 364 P2d 598 (1961). The presumption of assessment validity operates in favor of the party defending the original assessment and does not move with the commission's position. *Case v. Chambers,* 210 Or 680, 705, 314 P2d 256 (1957); *Reynolds Metals Co. v. State Tax Commission,* 227 Or 467, 472, 362 P2d 705 (1961). As Mr. Justice O'Connell noted (*West House, Inc. v. Commission, supra,* at 178):

> "Some point must be set as a relatively final stage in the tax collection process so that the taxpayer can, with some degree of certainty, make the necessary calculations as to the cost of doing business."

Thus, in this case, the law presumes that the original assessment for which the sheriff and assessor contend, not the modification made by the commission, is correct.

## Burden of Proof

As in income tax cases, the order of the commission has the practical effect of a judgment, unless modified, remanded, or reversed by this court. ORS

306.530(5); *Sproul v. Commission, supra.* To some extent its finality is even more definite, because, unlike an income tax assessment, the collection of a property tax cannot be stayed by this court while the assessment is being litigated in this court. ORS 308.630 (1).

ORS 41.210, states:

"41.210. Burden of Proof. The party having the affirmative of the issue shall produce the evidence to prove it. Therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side."

The party filing the complaint has the affirmative of the case. He is seeking the relief. In this case the sheriff and assessor seek a raising of the assessed value, or more exactly the setting aside of the commission reduction. CBT seeks a lowering of the assessment. As to their respective positions, each has the affirmative of the issue. Because of the judgment nature of the commission order, each would lose if the order is affirmed. On the surface at least, each has the burden of proof.

█ That this conclusion is, in fact, correct is put in some doubt by the decisions in *Inland Navigation Co. v. State Tax Commission,* 202 Or 339, 361, 274 P2d 104 (1954); *Case v. Chambers, supra; Oregon Worsted Co. v. State Tax Commission,* 217 Or 104, 117-18, 317 P2d 924, 342 P2d 108 (1959); *M & M Woodworking Co. v. State Tax Commission,* 217 Or 161, 191-2, 314 P2d 272, 275, 317 P2d 920, 925, 339 P2d 718 (1959); and *West House, Inc. v. State Tax Commission, supra.* In each of these cases, the court appears to hold that the existence of the presumption of assessment validity shifts the burden of proof. In *Case v. Chambers,*

*supra,* at 707, the court finds that the "taxing authorities have the affirmative of the issue," in the language of ORS 41.210. If such is the rule here, then the commission, not the county officials, would have the burden of proof.

Actually, we again are involved with a problem in terminology. If, as our Supreme Court said in substance in *Gwin v. Crawford,* 164 Or 215, 220, 100 P2d 1012 (1940), the term "burden of proof" has two meanings, one of which is synonymous with the "burden of evidence" or the "burden of producing or going forward with the evidence," then, these tax decisions are understandable, because a presumption may shift the burden of going forward with the evidence. *Simpson v. The Gray Line Co.,* 226 Or 71, 74, 358 P2d 516 (1961). On the other hand, if the "burden of proof" discussed in these tax cases is that defined by ORS 41.210, as *Case v. Chambers, supra,* seems to imply, then, the commission in this case must prove its valuation to be correct by a preponderance of the evidence, at least, and thus, with the presumption of validity against it, it must establish its valuations to be at least probably more true than false. See *Cook v. Michael,* 214 Or 513, 526-7, 330 P2d 1926 (1958).

That this could be the intended meaning of these cases can certainly be argued from the language used in a number of cases. In *Case v. Chambers, supra,* the court said, at 707-8:

> "* * * As to this, the taxing authorities have the affirmative of the issue, and the presumption in favor of the original assessment puts the burden on the county to show that the original assessment was incorrect, and that the listed property has been undervalued. [Citations omitted.]
> "And in this proceeding, which is a direct re-

view of the action of the taxing authorities, the same ultimate burden of proof exists, even though 'the findings and order of the commission shall carry a prima facie presumption of validity' (ORS 306.555).

"When the findings of the county officers, and then of the Tax Commission, are predicated upon a particular theory or method of determining value, *and it appears that this method is faulty,* the effect is that the taxing authorities have failed to overcome the presumption in favor of the original assessment. The burden then remains on the taxing authorities to establish the undervaluation by proving 'true cash value.'

"As applied to this case, the commission contends that when petitioner's factory cost was introduced, that was sufficient to make a prima facie case in favor of the additional assessment, thus shifting the burden to petitioner to show the true cash value of the inventories. And in the absence of a further showing of actual value, the commission contends that the additional assessment must stand. On the other hand, petitioner contends that when it showed substantial obsolescence, which was not reflected in factory cost, that was sufficient to invalidate factory cost as a sole measure of value; and that the burden remained on the county to prove actual value, failing which the additional assessment must fall." [Emphasis supplied.]

And, then after reviewing authorities cited by the commission, it said, at 711:

"11. To that extent, the cases cited by the commission support our view with respect to the burden of proof. We conclude that when the county (and thereafter the commission) chose to rely exclusively on petitioner's factory cost, *and petitioner showed that its factory cost did not make proper allowance for obsolescence,* the taxing authorities failed to overcome the presumption in favor of the original assessment. In the absence of satis-

factory proof of an undervaluation, the original assessment must stand." [Emphasis supplied.]

In *Oregon Worsted Co. v. State Tax Commission, supra,* the implication is clear that the burden of proof is on the commission to establish that the original assessment is in error. At 118, it said:

"9, 10. When the Commission has established, as in this case, that the total original assessment has been materially undervalued, the burden then *shifts* to the taxpayer to prove the amount thereof that is not subject to the additional assessment and taxation." [Emphasis supplied.]

In *West House, Inc. v. State Tax Commission, supra,* at 179, the court said:

"* * * We have held that the defendant [commission] has the burden of proving that the original assessment was not based upon the true cash value of the reported property. As taught in *Oregon Worsted Co. v. State Tax Com.,* (citation omitted), the burden of proof does not *shift* to the taxpayer until the commission has established 'that the total original assessment has been materially undervalued.' * * *"

Certainly, a cursory examination of such cases tends to confuse and to lead to interpretations which merge meanings and blur valid distinctions. See Lacy, "Evidence—1959 Oregon Survey," 39 OLR 19, 27 et seq., struggling with *Gwin v. Crawford, supra.* However, an interpretation of these cases as referring to the statutory burden of proof must either ignore the plain meaning of the definition of "burden of proof" in ORS 41.210 or it must strain that language by assuming that "if no evidence were given on either side" does not mean "no evidence" but rather "no evidence other than presumptions."

■ There has been a valid distinction in Oregon, "old and well stricken in age," between the burden of proof and the burden of evidence or of producing or going forward with the evidence. Under this distinction, the burden of proof is the responsibility of affirmatively prevailing as defined in ORS 41.210. Accurately speaking, this burden never shifts from the party having the affirmative—seeking the action of the court. *Carroll v. Royal Mail Steam Packet Co.*, 130 Or 294, 302, 279 P 861 (1929). In *Judson v. Bee Hive Auto Service Co.*, 136 Or 1, 9, 294 P 588, 297 P 1050, 74 ALR 944 (1931), the court stated the rule succinctly:

"The burden of proof never shifts from the party who has the affirmation of an issue, but the burden of proceeding with the evidence sometimes does."

On the other hand, the burden of going forward with the evidence is defined as merely the responsibility at any point in a trial of producing evidence to establish an affirmative case or to rebut an affirmative case already established. This burden shifts back and forth as the trial proceeds.

Viewed with the object of retaining, rather than discarding, this distinction, the language of the above-quoted tax cases can be interpreted so as to be no longer confusing. In *Case v. Chambers, supra,* the quotation refers (see emphasis) to a situation after the "giving" of evidence. This opinion states that "* * * when it appears that this method is faulty * * *" and "petitioner shows that its factory costs did not make proper allowance for obsolescence," then, under these circumstances, the "burden" shifts to the commission. Similarly, in the *Oregon Worsted Co.* and *West House, Inc.,* cases, *supra,* the court is talk-

ing about a burden which "shifts." Thus, since the burden affected by the presumption shifts and is influenced in its shifting by evidence adduced, it must be the burden of going forward with the evidence and not the burden of proof which is affected by the presumption. The burden of proof remains fixed with the party, or in this case, parties, seeking affirmative relief, the plaintiffs and CBT, regardless of the presumption.

### Effect of Presumption on Burden of Proof: County's Case

In *Sproul v. State Tax Commission, supra,* this court noted the quantitative effect of the presumption combined with the burden of proof and the quantum of proof. It was pointed out that, in that case, the presumption must attach to the commission's order which is the subject of the suit. Therefore, the plaintiff in an income tax case is invariably faced with the burden of proof and with the presumption against him. Since the great majority of ad valorem property tax cases find the commission defending the original assessment of the county officials, the usual property tax case will have the burden and presumption lined up against the taxpayer-plaintiff and much that was said in *Sproul v. State Tax Commission* would apply.

But this case with the original assessing officials as plaintiffs is quite different. Instead of joining the commission in supporting an assessment, they are supporting their own original assessment and asking that the commission's modification of that assessment be set aside. As pointed out earlier, this original assessment is the one to which the presumption of assessment validity attaches. Yet, in supporting this original assessment, these county officials have the affirmative

of the issue, the burden of proof, as they are seeking to set aside the commission's modification. Thus, though the county officials have the burden of proof, as the usual taxpayer-plaintiff does, they, unlike this usual taxpayer-plaintiff, are supported by the presumption of asessment validity.

The situation of these county officials as plaintiffs is analogous to that of the taxpayer appealing from an omitted property tax assessment under ORS 311.210, where, in the *Case, Oregon Worsted Co., Reynolds Metals Co.,* and *West House, Inc.,* cases, *supra,* the Oregon Supreme Court has found the presumption to support the original assessment and, therefore, aid the plaintiff-taxpayer. The foregoing quotations from these cases show clearly that the presumption of assessment validity, particularly when supported by other evidence, shifts the burden of going forward with the evidence. The burden of proof is on the county officials, but the presumption meets that burden to the extent of establishing a *prima facie* case and it shifts the burden of evidence. This result flows necessarily from the definition of a *prima facie* case as one which shifts the burden of evidence. The ultimate effect of this *prima facie* case established by the presumption is set forth concisely in *Foster v. Farra,* 117 Or 286, 302, 243 P 778 (1926):

> "When such a *prima facie* is established, the burden of evidence is shifted to the party who has not the affirmative of the issue, although the position of the burden of proof is in no way affected. If the party who has not the affirmative of the issue can impair the *prima facie* quality of the case against him, the burden of evidence thereupon returns to the party having the burden of proof: 22 C.J. § 21."

In effect, then the Wigmore-Thayer or "pure" presumption and the Morgan or evidentiary presumption would have the same effect in this type of case—that of shifting the burden of going forward with the evidence. However, while this function exhausts the Wigmore-Thayer presumption, the evidentiary presumption of Oregon remains in the case with probative effect. *Wyckoff v. Mutual Life Insurance Co.*, 173 Or 592, 598, 147 P2d 227 (1944). It remains in the case and does not disappear, and is considered with the other evidence by the trier of fact. *Sproul v. Commission, supra,* and the authorities therein cited.

### Effect of the Presumption on the Burden of Proof: Taxpayer's Case

In the case of taxpayer's counterclaim, the burden of proof and the presumption are against the taxpayer, CBT, as they were in the *Sproul* case and much said there applies in this case. The presumption lies against CBT, increasing its evidentiary problem. CBT not only has the burden of proof, but also the burden of going forward with the evidence.

### Effect of the Presumption on the Quantum of Evidence

This court in the *Sproul* case, *supra,* distinguished between the quantum of proof and the effect of the presumption of assessment validity in income tax abatement cases. In substance, it said that combining the two concepts had led to confusion and that often the courts had commented upon their combined effect in such a way as to lead the casual reader to believe that a higher quantum of proof than a preponderance of the evidence was required in income tax

cases, when what the courts sought to say was that the combination of the burden and the evidentiary presumption required more evidence to sustain the burden by a preponderance than the burden without the added effect of the adverse presumption. Thus, the *Sproul* case holds that in income tax abatement cases a preponderance of the evidence is required to sustain the burden of proof, that the presumption is some evidence against the one seeking to amass the preponderance, and that the weight of the presumption, as is true of the weight of all evidence, is for the trier of fact to determine.

In the *Sproul* decision, this court expressly refused to decide whether these rules applied to property tax cases. Similarly, while determining the placing of the burden of going forward with the evidence on the defendant commission, the Supreme Court in the omitted property tax cases of *Oregon Worsted Co., M & M Woodworking Co.,* and *West House, Inc.* cases, *supra,* and particularly in *Case v. Chambers,* took no position as to the quantum of evidence required in support of the commission to overcome the presumption. The reason for these *caveats* is *Appeal of Kliks,* 158 Or 669, 76 P2d 974 (1938).

## Clear and Convincing Evidence: Appeal of Kliks

*Appeal of Kliks, supra,* clearly established the presumption of assessment validity upon sound reason and logic. It went on to state (page 688) that "Clear and convincing evidence is required to overcome it." Since the presumption reached the ultimate merits of the case and lay against the taxpayer, who also had the burden of proof, the effect of this decision was to require the taxpayer to sustain his burden by at least

clear and convincing evidence—in the language of Mr. Justice O'Connell in *Cook v. Michael, supra,* at pages 526-7, by showing the truth of the facts asserted by him to be "highly probable," as in a fraud case. As has been pointed out earlier in this decision, this language was part of the process of limiting the scope of judicial review in tax cases. The decision based the rule, not on some inherent attribute of this type of presumption, but rather upon the problems created for judicial review in ad valorem tax cases.

If this rule of *Appeal of Kliks* is to be the rule in this case and the omitted property cases, the burden on the commission in sustaining its order should require the same degree of proof—clear and convincing evidence—a high probability of truth. As noted above, the Supreme Court, in the omitted property tax cases, expressly avoided the issue. *Case v. Chambers, supra,* (210 Or at 705). This court does not enjoy that luxury. It must decide this issue to make the evidence intelligible in this three-way case. The judicial process in taxation unavoidably stands at this legal Rubicon. This decision could be avoided only by holding that the commission does not have this heavy burden and by leaving unchanged the much heavier burden on CBT, the taxpayer. To do this would be to say that the presumption requires one degree of proof to overcome it if it lies against the commission and a very substantially greater degree of proof if it lies against the taxpayer. Such a result is patently unconscionable and cannot be justified by public policy under today's conditions. The only reasonable alternatives are to apply the heavier burden to all such cases or to re-examine the burden on the taxpayer. In the light of the substantial changes since 1938 already noted in this

opinion, a reexamination of the quantum required of the taxpayer would appear the most reasonable and fruitful course.

This decision notes above that *Appeal of Kliks* is one of the landmark cases of Oregon law, a case written by one of Oregon's most respected judges and relied upon in many cases in the quarter century since it was handed down. By adopting the course of reexamining one of the rules announced in that case, this court may appear presumptious in the extreme. At a time such as this, the statutory requirement that the tax court not only write but publish its opinions is a terrible burden. Gladly would it slip into the silent anonymity usual for a trial court and, with a brief letter memorandum, let the Supreme Court be the first to consider this dilemma and leave that high court to find its own reasons for affirming or reversing. But under its statute this court cannot do so. Instead it must rely upon the belief that Polonius' advice was given as certainly to the courts as to Laertes. Faced with the foregoing patently inequitable alternatives, it must proceed to consider the changes in conditions which occurred in this dynamic quarter century since 1938, many of which are based upon the sound rationale of *Appeal of Kliks*. Fully aware that it was this great opinion which showed the way to these changes and improvements, this court is of the opinion that such extensive and substantial changes and improvements warrant this reexamination.

■ Much that already has been said in discussing the scope of judicial review applies equally here, for it will be recalled that the presumption and its effect on the quantum of proof was the prime judicial tool used to keep judicial review within the bounds of its

effective action during the second period, the period of contraction from 1917 to 1953. That the conditions of 1938 have changed drastically has been extensively documented earlier in this decision and is relied upon again here. No longer is ad valorem taxation so feebly anchored to reality that a judicial decision might ravel the delicate fabric of county-wide uniformity. Today county-wide and state-wide uniformity are assured not by caution in the courts but by administrative and judicial insistence on fair market value appraisals, adherence to the statutory ratio, and continuous studies and reappraisals. No longer is the only resort from the expert assessor the overburdened, regular judiciary. This specially designed court has been created to provide in this field *de novo* determinations which, with due deliberation, consider both the rights and duties of the taxpayer and the technical problems faced by the assessor in the proper administration of his office. As pointed out earlier, the sound reasons firmly imbedded in public policy which prompted the quantum requirement of *Appeal of Kliks,* as a part of the judicial contraction of the scope of review, then thoroughly justified, no longer are valid under present conditions, nor is it the intent of the legislature that this limitation on the effective exercise of the judicial function continue, as evidenced by the 1961 amendments.

 Under today's conditions, the assessor would be amply protected from harassment by requiring a preponderance of the evidence and by preserving the presumption itself. When the presumption is combined with the burden of a preponderance, more evidence is required than in the normal civil case. A taxpayer plaintiff must adduce enough evidence to overcome the

presumption and enough additional evidence to sustain the preponderance. The presumption is evidence which goes to the merits of the case, not a single fact, and as pointed out by this court in *Sproul v. Commission, supra,* this breadth of the presumption distinguishes it from the normal statutory presumptions of a single fact. To require clear and convincing evidence to overcome the presumption is tantamount to increasing the normal burden of proof for the entire case to that required in fraud cases. Oregon's judicial review is not based on a theory of constructive fraud, as is the case in some other states. *Appeal of Kliks, supra,* at 687; see also discussion in Hellerstein, *op. cit.* (14 Tax L Rev 327). The prompt and proper collection of the revenue and the orderly tax administration no longer requires such additional protection under our present, vastly improved administration.

The only other justification for such quantum would be that it is an inherent attribute of a presumption of this nature. This is not the case in Oregon. An identical presumption, that of the validity of an administrative finding as to the entire issue before the court, has been recognized in industrial accident cases. *Dimitroff v. State Industrial Accident Commission,* 209 Or 316, 340, 306 P2d 398 (1957). To overcome this presumption a mere preponderance of the evidence is required. *Larson v. State Industrial Accident Commission,* 209 Or 389, 400, 307 P2d 314 (1957). Yet there would be far more reason for an increased burden in the industrial accident case involving highly technical medical evidence tried to a lay jury than there would be today in the trial of a tax case to an expert tax court.

Thus, the extensive change and improve-

ment of the conditions under which ad valorem taxation operates, especially in view of the decisions as to the similar presumption in the *Dimitroff* and *Larson* cases, *supra,* no longer justify the requirement of "clear and convincing evidence" to overcome the presumption. Instead the presumption now should take on its normal function as evidentiary material, to be weighed with the other evidence. It should not be used any longer to alter the quantum of proof required to sustain the burden of proof from the preponderance required in other civil cases. In the normal taxpayer plaintiff case, the existence of the presumption as evidence will require some more evidence to sustain the burden of the preponderance, but how much more should be a question of weight for the trier of fact in the light of all other evidence and the circumstances of the case. This would place property tax cases on the same evidentiary basis as income tax cases and would equalize the burden on the taxpayer and the various taxing authorities without placing the greater burden on the latter, which would be the only other equitable alternative, as the Supreme Court's avoidance of this conclusion indicates. To hold otherwise, and under these radically changed conditions of today, to retain the rule of *Appeal of Kliks* requiring clear and convincing evidence and the corollaries flowing from it such as that of *Knappton Towboat Co. v. Chambers,* 202 Or 618, 623-4, 276 P2d 425, 277 P2d 763 (1954) requiring proof that the contested valuation "lies outside of and beyond an area where reasonable minds might differ," would defeat the purpose intended in the creation of this court, discussed at length earlier. Such a burden would render practically nonexistent the intended rights of the taxpayer to an effective, in-

dependent, plenary, *de novo,* judicial determination of his rights and duties under our tax laws. The few cases that might meet such a test, whereby clear and convincing evidence the assessor's valuation ·can be shown to be wrong, to be beyond an area where reasonable minds might differ, could be decided just as readily and effectively as they were before 1961, by the circuit courts in a summary manner upon the record made before the commission.

### Summation of Evidentiary Rules

██ In summation, then, this court holds that the evidence in this case is to be interpreted under the following evidentiary rules: (1) The burden of proof is upon the party seeking relief from the commission order and this burden does not shift. In this case this means that the county officials must prove their claim for a higher valuation and CBT must prove its claim for a lower valuation. (2) The quantum of evidence to sustain this burden is unaffected by the presumption of assessment validity and is a mere preponderance of the evidence in each case. (3) The presumption of assessment validity applies here and attaches to the original assessment, not to the commission's correction. (4) The presumption is evidentiary in nature and has probative value. It remains in the case as evidence, to be weighed by the trier of fact with all other evidence. Its weight is determined by the trier of fact in the light of all the other evidence. (5) The presumption has the effect of shifting the burden of going forward with the evidence when it supports the case of a party having the burden of proof. Thus, though the county officials as plaintiffs have the burden of proof, the presumption establishes their *prima facie* case, and the burden of going forward with the evidence shifts to the commis-

sion with respect to the plaintiffs' case. As to the taxpayer's case, CBT has both burdens. What this court said in the *Sproul* case about the three methods of meeting the presumption would appear to apply here also.

## VALUATION QUESTIONS

Having determined the rules by which the evidence as to value is to be measured, these rules now must be applied to the evidence adduced in this suit to determine the value of the personal property in controversy on January 1, 1960.

Although there are 410 items of personal property in some stage of controversy, these items can be broken into two distinct categories. One category is composed of the 366 skeleton log cars. These are the items adjusted in value by the commission. The remaining 44 items, while perhaps specially adapted to CBT's railroad problems, are basically usable on railroads generally. As to these items, CBT seeks a reduction and the county officials and the commission agree as to value. Because the log cars present more problems in valuation, because their value is disputed separately by each party, and because what is said concerning them largely applies to the remaining 44 items, the log car category will be considered first.

### Value: Statutory and Regulatory Terms

In dealing with hard-to-value, rather unique, items such as these log cars, the initial question is what is the value being sought.

In 1960, the statutes provided that all property, both real and personal, was to be assessed at its true cash value or at a uniform percentage thereof. ORS 308.232. This uniform percentage, the so-called ratio,

is not in dispute here. The issue is the true cash value of the railroad equipment of CBT, not the ratio applied as that true cash value to reach assessed value.

True cash value was defined in 1960 by ORS 308.205 as the amount a willing buyer would pay for the property to a willing seller "at a voluntary sale in the ordinary course of business under normal conditions." The commission was given authority to prescribe normal conditions, which it did for real property in the form of an adjusting percentage factor. The commission was further directed to prescribe rules and regulations for the determining of true cash value. No adjusting percentage factor was prescribed for personal property in 1960. By its regulation Art 8205.2, the commission provided that the true cash value of all personal property, other than inventory, was market value. For a more complete definition of market value, it referred back to Art 8205.1, the regulation concerned with the true cash value of real property.

After prescribing that true cash value of real property was computed by finding its market value and applying to it the normal conditions factor, Art 8205.1 proceeded to define market value as follows:

> "Market value, as a concept, assumes that there are buyers and sellers for all properties. Actually, as related to a particular class of property, a market may or may not exist.
>
> "1. Market value as a basis for true cash value shall be taken to mean the amount of money or money's worth for which property may be exchanged within a reasonable period of time under conditions in which both parties to the exchange are able, willing and reasonably well informed.
>
> "2. When *sales* of similar property are *infrequent* or *lacking,* the *market value* shall be *con-*

*strued* as the *value of that property to the owner* and shall be *further defined as that amount of money that would justly compensate the owner for loss thereof.*" [Emphasis supplied.]

Under this regulation, the first step is to determine the existence of a market. If a market exists, then true cash value is the market value as established by the market. If there is no market, then true cash value is the value of the property to the owner, the amount which would justly compensate the owner for its loss. The correctness of this alternative to market value when no market exists is supported by statute. It was adopted in 1955 as part of the statutory definition of true cash value to be operative in 1961 when market value and true cash value became synonymous. Oregon Laws 1955, ch 691. It had to remain regulatory, not statutory, so long as true cash value and market value were not equated because of the normal conditions factor. Thus to determine the proper measure of value, the existence or nonexistence of a market must first be established.

## Defining a Market

The term "market" is not defined in either the statutes or the regulations. ORS 308.205 in 1960 used the term "in the ordinary course of business," which seems to assume a transaction which for both parties is ordinary, not unusual. It has been defined as not including sales where a substantial part of the assets are being disposed of and not replaced. *Appeal of Kliks,* 158 Or 669, 689, 76 P2d 974 (1938); *State Tax Commission v. Consumer's Heating Co.,* 207 Or 93, 124, 294 P2d 887 (1956). Generally, scrap or liquidation sales are not in the ordinary course of business.

*Appeal of Kliks, supra,* at page 689; *Case v. Chambers, supra,* at page 703.

■ Reg 8205.1.A.2 provides for the just compensation value to be used "when sales of similar properties are infrequent or lacking." Presumably, then, there is no market when sales of similar properties are infrequent or lacking.

No definition of market has been found in the reported Oregon cases and very few in other jurisdictions. However, the authorities in defining market value assume sales in an "open market freely," *In re Estate of Frank,* 123 Or 286, 289, 261 P 893 (1927); or "a definite and established market," a condition where the personal property "changes hands for money so regularly that a market price for it is created or maintained," *Helvering v. Kendrick Coal & Dock Co.,* 72 F2d 330, 333, 14 AFTR 439, 442 (CCA 8, 1934).

Among the texts, Corpus Juris Secundum, in discussing a market sufficient to establish market value, says (55 CJS 789):

> "In this sense, it is established when other property of the same kind has been the subject of purchase or sale to so great an extent and in so many instances that the value becomes fixed, but individual dealings are not competent to prove it."

■ Thus, for a market to exist from which market value of personal property can be determined, it appears that the same kind of personal property must change hands freely and openly in the ordinary course of business so regularly, to so great an extent, and in so many instances that a market price, a recognized value, for it is created or fixed. When sales are lacking or infrequent or not in the ordinary course of business, a market for purposes of market value is not

established. Disagreement and confusion as to the existence of a market and a misunderstanding as to the function of market value, evident in both the testimony and counsel's questions and argument, caused much of the problem in the valuation of the skeleton log cars.

### Skeleton Log Cars—Existence of a Market

The evidence disclosed that ten years ago many lumber companies in Oregon and adjoining states operated their own logging railroads to haul the timber to the mill. About 1953 or 1954, this method of hauling became impractical for reasons not disclosed in this record and by 1960 almost all the logging company railroads in this area had gone out of business. The only remaining ones which the witnesses could recall were Weyerhaeuser at Klamath Falls, Hines Lumber Co. between Hines and Seneca, possibly one at Gilchrist, and the Coos Bay Timber Co. line in issue here. During this ten year period the other roads had put their rolling stock on the market. There was testimony concerning many liquidation sales. Because the potential buyers had been reduced to Weyerhaeuser, Hines, and Georgia-Pacific (CBT's parent company) and because these three companies were also closing down other roads of their own, most of these sales were not of used log cars for re-use as such but rather were scrap sales to dealers in railroad scrap. Most of the cars that CBT purchased during this period were bought from the scrap merchants who bought the original offering. Frequently, the purchase price was only slightly more than the metal in the car would bring as scrap metal.

CBT did purchase at a number of these sales. In a few instances, the entire car purchased was usable, but in most cases, CBT dismantled the cars, shipped

the usable parts to its shops at Powers, Oregon, sold the unusable parts to scrap metal dealers, and used the usable parts in the construction of cars or the repair of old cars. In other words, from a stockpile of components which it built up by purchasing at these sales, CBT repaired and reconstructed its skeleton log cars. The testimony is clear that no new log cars have been built for over 30 years and this method of repairing and replacing log cars appears to have been general among the three large companies still operating railroads.

▉ Under these circumstances, there was no market for skeleton log cars on January 1, 1960, and had not been one for many years. The only sales had been scrap or liquidation sales, which do not determine market value. *Appeal of Kliks* and *Case v. Chambers,* both *supra.* The scrap cars had not been bought as log cars but as a means of obtaining parts and components. The prices paid were little, if any, above the prices that the metal in the cars would bring per pound as scrap metal.

The evidence discloses only one sale of cars relatively ready for use. This was a sale for $650 a car by a railroad of which CBT and its parent Georgia-Pacific Corporation are customers. But for a sale to one of these three large customers, the going price of scrap metal was all the railroad reasonably could expect to receive for those cars. This single figure hardly is a reliable one for use in a market data approach, or even as a mere check on some other approach.

▉ C. H. Mack did testify that in his opinion there was a market established. As a State Tax Commissioner, his opinion is entitled to very substantial weight based upon his experience and knowledge. Leonard

Helgeson, also of the State Tax Commission, gave similar testimony. However, the great weight of the evidence is to the contrary and, in addition, they seem to be confusing a market for scrap parts and components with a market for the cars themselves. The market to which the statute and regulations refer is not a parts market but a market for log cars, the entire item being valued. It is this confusion of a market for used parts or components with a market establishing a market price for the cars which is one of the bases of this controversy.

■ Since there is no market for log skeleton cars, the true cash value of these skeleton log cars is not market value but rather the alternative value to the owner or just compensation value.

### Method of Valuation

■ The regulations set forth the recognized appraisal procedures to determine this type of value in Art 8205.1.B:

"B. Methods:

"For ad valorem tax purposes, the appraiser is concerned with estimating the market value of a given property. Various techniques have been developed which, if properly used, should approximate market value when a market actually exists. When a market is non-existent, these techniques, if properly used, will approximate the value to the owner. These techniques are:

"The Cost Approach, or Summation Method
The Income Approach, or Income Capitalization Method
The Market Data Approach, or Comparative Method

"Any one of these techniques, or all of them, or variations may be used to assist the appraiser in arriving at his estimation of market value."

In valuing these skeleton log cars, the assessor used the cost approach method as established by the commission regulation. He determined a replacement-cost-new, then applied depreciation, both age-life and observed, and arrived at his values. On the other hand, the commission and CBT combined and confused the cost and market approaches. Disagreeing on the figures to be used, nonetheless, both of them computed from the sales of scrap cars a cost of reproducing these cars from used, scrap parts, used this cost in lieu of replacement-cost-new, then applied depreciation, again disagreeing on amount, and arrived at their values. This disagreement over methods puts in issue the question of method.

■ More accurately, the disagreement puts in issue the incorrectness of the assessor's method. Clearly, the presumption of assessment validity extends not only to the assessor's computations and valuation judgments but also to the method used by the assessor in arriving at value. *Northern Pacific Ry. Co. v. Clatsop County,* 74 Or 250, 256, 154 P 271 (1915); *Case v. Chambers, supra.* The presumption establishes a *prima facie* case that the assessor's method was the correct one to use. The commission and CBT have the laboring oar to show by a preponderance not merely that their respective methods are valid or usable but also that the assessor's method was not a correct one to be used. *Case v. Chambers, supra.*

■■ Certainly, the assessor's method was that directed by the regulations. The regulations specify replacement-cost-new and do not mention reproduction-cost-used. While these regulations are not conclusive, they are of substantial persuasion. *Keyes v.*

*Chambers,* 209 Or 640, 661, 307 P2d 498 (1957). With the presumption supporting the method or formula used by the assessor, the duty is upon those attacking the method to show the method clearly in error and to offer an alternative method which they establish as being correct. *Consolidated Freightways, Inc. v. State Tax Commission,* 230 Or 522, 530, 370 P2d 224 (1962); *Case v. Chambers, supra* at page 707.

 .While considering these procedures set up in Art 8205.1.B, it must be borne in mind that they are basically real property appraisal methods and there is a definite difference between real property appraisal and personal property appraisal. In appraising real property, the appraiser always is seeking to determine a theoretical market value only. Each parcel of real property is different from all others and this difference or uniqueness is recognized in the law. *Slattery v. Gross,* 96 Or 554, 558-560, 187 P 300, 190 P 577 (1920); 49 Am Jur § 92. Therefore, as to real property all three approaches to value are used and weighed. On the other hand, personal property, except in rare instances, is not similarly unique. The law assumes that a market in the same kind of personal property establishes a market value for all that kind of personal property similarly situated. *Livesley v. Johnson,* 45 Or 30, 49, 76 P 13 (1904). Therefore, the market approach alone determines market value for personal property, where there is a market, and the income and cost approaches are inapplicable. In appraising personal property, these other two approaches only have validity, if at all, where the market approach is inapplicable. Until it is discarded as inapplicable, the market approach controls. When it must be discarded, as it must here, because no market

exists, it in turn has no validity and there are only two approaches remaining. Much of the controversy in this case comes from vestigial consideration of the market approach after it should have been, and largely was, discarded.

■ Of the other two approaches now that the market approach has been discarded, the income approach rarely has any applicability to personal property. This is because of an inability to apply it with any accuracy. It is almost impossible to allocate income to specific personal properties. None of the parties considered it of any value in this case, and rightly so. This leaves only the cost approach applicable in this case.

■ It was this cost approach which correctly the assessor used. In fact, both the commission and CBT used a strained version of it in part. None of the evidence impeaches the use of this method. Thus, neither the commission nor CBT has sustained the burden of proving it incorrect. Therefore, to prevail they now are reduced to showing an error in the use of the method to arrive at value, either an undervaluation or an overvaluation. *Case v. Chambers, supra*, 210 Or at 707. Both contend for an overvaluation. Stripped of its misconceptions as to the existence of a market and the effect of the supposed market, and reduced to its central problem, this case revolves around the interpretation and application of this cost approach.

### Cost Approach: Application

The cost approach is explained in the commission's regulation Art 8205.1.B.1.b. as follows:

"b. The structural *improvements* [here translated to personal property] are valued by estimat-

ing the replacement cost new at current costs and subtracting depreciation.

"(1) *Replacement cost new* is the cost of replacing a structure with a similar and comparable one of equivalent utility. It shall be estimated by use of acceptable factor books as announced by the State Tax Commisison in compliance with Art. 8275 and supplemented with other available data covering current costs.

"(2) *Depreciation* as used in appraisal practice is the difference between replacement cost of the building at current prices and its value today "as is." It is simply a loss in value regardless of cause. The causes may be grouped under two headings, deterioration and obsolescence. Obsolescence includes those causes which are either functional or economic. There are two acceptable methods of estimating depreciation.

"(a) The *observed condition* method is based upon inspection of the property by the appraiser and a comparison with a similar new property. The inspection is an engineering study of deterioration, functional defects and other conditions which affect the property's desirability.

"(b) The *age-life* method depends upon the idea that properties can be classified into categories having average predictable life spans and rates of depreciation. It is based upon empirical tables which reflect the experience in the various categories. These tables may be prepared to reflect a constant rate of depreciation (the straight-line method) or a decreasing rate of depreciation (the curved-line method)."

In their attack upon the assessor's use or application of the method, the commission and CBT assailed both the assessor's determination of replacement-cost-new and his depreciation figures and techniques.

### Replacement-Cost-New

The assessor applied his method as follows: First, he consulted Leonard Helgeson, Chief of the Industrial Section of the Valuation Division of the State Tax Commission. Helgeson recommended the cost approach and after inquiry and study he also recommended the use of Rule 112 of the Association of American Railroads (hereinafter called "AAR") as a starting point. This rule is, in essence, an agreement between the U. S. railroads under which they compute the amount to be paid to the owning railroad when one of its cars is destroyed or heavily damaged while being used by another railroad. It is based upon the combined experience of all these roads and is frequently modified to reflect economic conditions. In reality, it computes the value of the car to the owner, his just compensation upon its loss.

■ The attack upon the use of this rule took two directions. First, it was contended that the rule did not establish replacement cost but was merely an arbitrary agreement between the railroads entered into to avoid dispute. This argument is scarcely tenable. After all, the railroads can be assumed to be interested in getting fair value for their destroyed cars and, acting in concert, they would have a better idea than anyone else what the cost of replacement was. Aside from this argument, the use of Rule 112 is sanctioned by our Supreme Court. The last new log car built was constructed about 1930. There was no current data on their actual replacement costs. In this circumstance, the criteria used to obtain value in condemnation or used by utilities in ratio-making is appropriate. *M & M Woodworking Co. v. State Tax Commission, supra; Appeal of Kliks, supra.* Helgeson had obtained Rule

112 from the Oregon Public Utilities Commissioner, where it is relied upon in rate-making. In addition, the accidental destruction of railroad cars and the use of the rule by the railroads to compensate for those destroyed cars is in the nature of inverse or involuntary condemnation. In any event, no alternative was offered and while the use of Rule 112 was criticized, the presumption as to its correctness was not overcome. Under this factual situation and the foregoing decisions, the use of Rule 112 appears wholly justified.

The second attack upon the use of AAR Rule 112 was largely factual. The rule did not provide replacement figures for log cars as such, so the assessor used the rule for flat cars and adjusted for the structural differences in the two cars. While some question as to weight and the structural adjustment was raised, the method appears sound and the evidence, taken as a whole, supports the assessor's computation.

### Depreciation

To the Rule 112 computation the assessor applied the curved-line, age-life depreciation directed by the commission's regulation 195.2 (Exhibit 36). This resulted in more than 50 per cent depreciation. The Coos County policy was not to depreciate industrial equipment by the age-life method below 50 per cent of cost and under this policy the assesor allowed 50 per cent age-life depreciation.

Then the county's appraiser, McKay, together with Helgeson, made a physical inspection of 72 of the 366 cars. From this inspection, they determined that more than 50 per cent actual reduction in value had occurred and allowed additional depreciation. Because some of the cars had small journals, they allowed more observed depreciation to them. There was some dispute

as to the number of cars with smaller journals, but since McKay and Helgeson did not inspect all the cars, the CBT figure of 100 cars with small journals was accepted and used by the county, and was not disputed by the commission.

■ Objections were made to the depreciation procedure on the ground of the choice of depreciation rate. While the evidence does not support one rate more clearly than the other, the range is so narrow, little more than a one per cent differential, that reasonable and exact appraisers could differ readily within the amounts suggested. The presumption supports the the assessor and he has not been proved in error by a preponderance of the evidence.

A second controversy arose over whether under AAR Rule 112 these cars were "rebuilt cars." Certainly, technically speaking, they were not. However, all Rule 112 could not be applied to private log cars in any event, and there was ample justification in the evidence for computing their replacement cost as rebuilt cars. The controversy is rendered moot in any event, by the 50 per cent rule in Coos County. If they were not rebuilt cars under Rule 112, then replacement cost would have figured the same way, but the age-life depreciation allowance would have been greater. If, under the procedure in Coos County, that age-life depreciation had been more than 50 per cent, the excess over 50 per cent would not have been allowed anyway. In any event, actual, observed depreciation, rather than a rate-table, was used, which disposes of any argument on this score.

A third controversy arose over the adequacy of the inspection for observed depreciation. One-fifth— 72 out of 366—of the cars were inspected. There is no

evidence that these cars were not representative, except possibly as to the size of journals. Only a very few of the cars inspected had the small journals. However, this discrepancy was disposed of by taking the CBT figure of 100.

A fourth, and the most important, controversy arose over the failure to use the AAR depreciation schedule in Rule 112, rather than the commission-approved, curved-line schedule, stopping at 50 per cent. If the county was to adhere strictly to the utility rate-making approach, Rule 112 should have been followed for both replacement-cost-new and depreciation. However, as the assessor's able counsel pointed out, the purposes of utility regulation and ad valorem taxation differ substantially. Basically, depreciation in rate-making is an accounting or cost recovery procedure. In utility rate-making the value of equipment is considered so that the cost of the equipment can be recovered over the life of the equipment. In ad valorem taxation, depreciation is not allowed so that cost may be recovered, but rather so that the reduction from original cost or value for physical deterioration, obsolescence, and the like can be allowed against that original cost or value, thereby arriving at present value. The concept of value in one field does not necessarily equate with the concept of value in another field. See discussion in Bonbright, *Valuation of Property*, ch 1. For assessment purposes it was not error to vary the depreciation so as to arrive more nearly at the type of value sought.

One further depreciation question was not raised directly but looks up from the page with a Cyclopean stare, that is, whether the 50 per cent rule applied to one class of property, i.e., industrial equipment, is

proper. With the true cash value of all property equal to fair market value, there is serious doubt whether such arbitrary limitations—though they equalize values within a class—do not destroy equalization within the county. Fortunately, the question can go unanswered in this case because the actual depreciation allowed was based upon physical inspection and was not limited by this arbitrary factor.

At this point it would appear that this court is affirming the assessor's original assessment. It is affirming the assessor's determinations that no market existed, that market value could not be used as the measure of value, that the income and market approaches are inapplicable, that the cost approach is the basic approach to be used, that AAR Rule 112 was a proper means of determining replacement-cost-new, that ad valorem depreciation rather than that of Rule 112 should be applied, and that depreciation was properly computed. In other words, to this point the assessor is correct. But the one feature from which this controversy actually arose is yet to be considered, the fact that CBT could replace these cars by building cars of equal utility and worth from used components purchased at scrap sales and its own lumber and labor for much less than the assessor's true cash value. This fact was ignored by the assessor in refining his cost approach value and to this extent his application of the cost approach was in error.

### *Principle of Substitution: Applicability*

■ Because CBT could build like cars for less, the principle of substitution enters this appraisal. This principle is that a person will not pay more for an item than he must pay for a comparable (substitute) item. It is generally applied in Oregon under commis-

sion regulation Art 8205.1.3. If one would not pay more for such item, he does not value the item at a greater figure.

The evidence shows that CBT and the few remaining logging railroads could, and regularly did, reproduce a skeleton log car by using the components purchased at scrap prices and by adding other components. These cars were equally as serviceable as those on CBT's road and at issue here. In fact, many of the ones at issue were made this way. There is a factual dispute as to this cost of reproduction but highest of the figures does not come close to the assessor's valuations of $1,500 and $1,750. If the cars can be built and substituted for very substantially less than $1,500 and $1,750, then under this principle of substitution they have no more value than the cost of substitute.

This principle of substitution is the basic reason behind the market data approach to value. If, in the market place, a comparable (substitute) item of personal property can be purchased for less than its replacement-cost-new less depreciation, then, assuming a true market, the market sets value. Here there is no market and no market value can be determined, but the cost of reproducing a substitute can be determined. Therefore, though the proper and usual method of determining value in this case is the cost approach of replacement-cost-new less depreciation, the cost of a substitute cannot be ignored in refining the value obtained by the cost approach.

### Principle of Substitution: Application

The commission and CBT made this same determination, but they then erred in its application. Properly, the principle of substitution reflected in market value limits the ultimate value determined by the cost

approach. Instead of so applying this substituted cost, the commission, contrary to its own regulations, used this substitute cost in place of replacement-cost-new. In effect, it said cost of substitution less depreciation equals true cash value. It made this error by confusing the proper function of the principle of substitution and secondarily by giving too much weight to theoretical depreciation as opposed to actual depreciation. But most important, it made this error because it lost sight of the nature of the value being sought.

■ It has already been established that the true cash value of these cars is their value to their owner, not market value, that the components were purchased virtually at scrap metal prices, and that a "scrap," "tear down" or "liquidating" price is not true cash value. In this circumstance, the substitution value of scrap components plus CBT's own labor and lumber does not independently determine the value to the owner. Instead, this substitution cost fixes the upper limit of value to the owner by fixing the cost or price at which he could find or create an acceptable substitute. Bonbright, *Valuation of Property,* 156-7. It is a limiting factor on the cost approach determination, not a means of determining replacement-cost-new. By very definition, used, scrap parts cannot be part of replacement-cost-new used in the cost approach. Furthermore, theoretical, as opposed to observed, depreciation cannot be applied to parts whose used price already reflects depreciation.

■ Thus, as to personal property where, as here, there is no market, there is no market value and the market data approach does not apply. Rarely does the income approach apply. In these circumstances, the true cash value can be computed only by the cost ap-

proach. The cost approach starts from replacement-cost-new. Where the principle of substitution applies, as here, the substitute cost is not substituted for replacement-cost-new. Instead it is a limitation on the value arrived at by the cost approach. To the extent that this limitation was not considered, the assessor's value was in error and the presumption was overcome. It is in this light that the rest of the evidence must be viewed.

### Computing Cost of Substitution

In determining the cost of substitution, this court has relied heavily on the testimony of Robley Doyle. He was the superintendent of CBT's railroad in 1960 and had been with that road since 1935. He was no longer in CBT's employ. He was called by both the county and the commission as an expert and was the only witness who had been closely connected with the rebuilding of cars by CBT. Corrigan, the present Georgia-Pacific railroad superintendent, was the only other witness as to the cost of rebuilding these cars, and while admittedly expert, he was not familiar with this road and had not been connected with it prior to October, 1960.

The testimony was extensive about various scrap sales of used cars at which CBT purchased cars for parts. These sales from 1954 to 1959 varied in price from $1,000 each to $225 each. In his testimony Doyle used an average price of $450. From the evidence this figure seems to be the best average available. To this price must be added the costs of rebuilding the car.

Doyle's testimony showed the total cost of the rebuilt cars to be $1,070. In this computation, he figured the lumber for the wood parts at market price and included the usual overhead costs. Of course, no con-

sideration was given to manufacturing profit, which CBT would have had to pay if it had not had its own shops. Giving some minor adjustment for this element to round out the figure, this court finds the substitution cost to be $1,100 a car.

The only remaining question as to the log cars appears to be whether any adjustment should be given to the 100 cars with the smaller journals. All three of the parties allowed such an adjustment in their appraisals. The testimony is that these cars are being replaced by rebuilt cars with the larger journals. Since the smaller journal cars do not have the utility of the substitute, some allowance should be made for this feature. Furthermore, the component part price used in Doyle's computation was for the heavier journal. Since the cars with the smaller journals are being replaced, the components would have no value for resale as component parts. This means that they would go for scrap. The scrap price of the steel in 1960 appears from Stanley Oslund's testimony to have been $225, or one-half of the $450 used for components in Doyle's calculation. An adjustment of this $225 is warranted. As further justification for this amount of adjustment, it happens that this figure is the average of the $200 differential allowed by this commission and the $250 allowed by the county. This adjustment makes the adjusted substitution cost on the 100 cars with smaller journals $875 each.

## Log Car Values

These substituted costs are applied as the upper limit of value by the cost approach. Since the cost approach resulted in values of $1,750 and $1,500, respectively, the values must be reduced to the substi-

tution cost figures. This results in this court finding the true cash value of the 100 cars with the small journals to be the substitution cost of $875 each, for a total of $87,500 and that of the remaining 266 cars to be $1,100 each, for a total of $292,600.

## Other Equipment

The evidence concerning the remainder of the equipment is spotty at best. As to it, CBT alone has the burden of proof and, the weight of the presumption being against it, CBT also has the burden of going forward with the proof.

*Steam Locomotives.* The dim record made as to the steam locomotives scarcely discloses the method used by the assessor in arriving at a unit value of $6,000 each for two locomotives and $2,000 for No. 9 locomotive, which latter was being used for parts only. One of the others was in use in 1960 and the other was ready in a standby classification.

CBT produced appraisals by Stanley Oslund valuing the parts locomotive at $850 in 1960, and valuing the working locomotives at $4,500 in 1958 and $3,500 in 1960. He arrived at these values by using the market data approach and his was the only market data testimony.

Apparently, there was a market for these locomotives. There is nothing indicating that they had peculiarities sufficient in nature to destroy this market. Therefore, the market value would appear controlling. As to the two steam locomotives in working condition, this court finds their true cash value to be their market value of $3,500 each.

There is no evidence as to the parts value of locomotive No. 9, which was being used for parts. Obviously, it does not have a market value except as parts.

Without any substantial evidence to show the parts market, the assessor's determination at $2,000 is affirmed.

*Diesel Locomotives.* The only testimony on the diesel locomotives was elicited from Robert Oslund, the tax agent of Georgia-Pacific Corporation, and Helgeson of the commission. Both the assessor and Helgeson had used the cost approach, starting with a replacement cost obtained from the original manufacturer. They used no other approach to value and arrived at a unit value of $105,381.

Oslund offered testimony that there was a market for used diesel locomotives. In his original appraisal, Oslund relied upon the market data approach alone to obtain a figure of $65,000. He later revised his valuation upwards after considering the cost approach. His final figure was $80,000 each.

A large part of the testimony as to these locomotives centered around the additional features of these engines added upon the specifications of CBT. It was established that these locomotives had an unusually high ratio of horsepower to weight ratio and that this was needed by CBT because of weight tolerances on their trestles. In other words, a high horsepower was needed for the pulling job on the log trains but a low weight was needed for the trestles. Clearly, these engines could have been sold by CBT to other users for less. The additional CBT features did not destroy their marketability. On the other hand, these unique features both increased the original cost of these locomotives and enhanced their value to CBT. There was no market upon which a like locomotive could be purchased by CBT, even one which could be remodelled for its purpose.

Therefore, we are dealing again with the value to the owner and again the principle of substitution may come into play. The assessor's method of valuing the cars was incorrect to the extent, if any, that this principle was applicable and in fact he failed to take it into consideration.

■ But there is no evidence that CBT could replace these locomotives for any less than the depreciated cost used by the assessor and the commisison. The point of the principle of substitution is that the owner will pay no more than it costs him for an adequate substitute, not that the owner would pay no more than he would get if he sold his equipment. There was no used market that even with rebuilding could establish a lower substitution cost, as in the case of the skeleton log cars. The only method to compute value was the regular cost approach. Therefore, the assessor's assessment was correct.

*Cabooses.* There is nothing in this record which indicates that CBT's cabooses were so different from standard cabooses that they could not be replaced by standard cabooses without the loss of utility to CBT. The testimony is that the assessor used only the cost approach in his valuation. From Stanley Oslund's testimony, it appears that there is a market in used cabooses and that comparable cabooses can be obtained on that market for $3,150 each. This was substantially less than the value determined by the cost approach. The only market value testimony being that given by Oslund, the true cash value of these cabooses is that price at which they can be replaced on the market, $3,150 each.

■ *Diesel Crane and Attachments.* Robert Oslund again gave the only market value evidence on the diesel

crane equipment. His valuation, based on the market data approach, was $28,500, while the assessor's cost approach figure was $30,860. Despite the conflict in approaches this difference, on equipment of this size and value, appears within the margin of difference permitted to two competent appraisers. It is not sufficient to impugn the assessor's value, which here is affirmed.

■ *Other equipment.* All the other equipment appears to be regular railroad equipment and not substantially unique. There is no evidence to the contrary. Therefore, it appears that like equipment could be purchased on the used market which would adequately fulfill the same functions. The only evidence as to the cost of this equipment on the market is the testimony and letter appraisal of Stanley Oslund. On the other hand, the assessor has ignored the market and used the cost approach alone. Where there is a market, where the normal principle of substitution can be applied, this is error. This court, under the law and regulations, must accept the market value of personal property as its true cash value in this circumstance and must rely upon the only market value evidence in the record.

However, in a few instances, CBT has made an upward revision in the Stanley Oslund figures. Where CBT has so increased Oslund's figures, this court will adopt the higher CBT figures.

The evidence as to the number and description of tank cars is confusing, but the presumption favoring the assessor's listing has not been overcome. Furthermore, it was this listing which Stanley Oslund valued. With the exception of the 4,000 gallon diesel fuel car,

Oslund's figures are accepted. The value of the 4,000 gallon car is $600, the higher CBT figure.

A decree will be prepared under Rule 32 in conformity with this decision, allowing none of the parties their costs.

Rendered, at Salem, Oregon, this 7th day of November, 1962.*

---

* Foregoing case appealed. Oregon Supreme Court opinion found in 236 Or 299, 388 P2d 286 (1964).